STATE ex rel. UTILITIES COMMISSION v. PUBLIC STAFF

[333 N.C. 195 (1993)]

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION and CAROLINA TRACE CORPORATION, Applicant-Appellee v. PUBLIC STAFF—NORTH CAROLINA UTILITIES COMMISSION, Intervenor-Appellant

No. 385A91

(Filed 8 January 1993)

1. **Utilities Commission § 35 (NCI3d)— water and sewer services—utility plant not currently used and useful—extraordinary expense retirement**

The Utilities Commission erred by finding and concluding that an investment cost in physical plant that is not used and useful should be charged to expense and recovered through amortization as an extraordinary property retirement where CTC, a public utility providing water and sewer services in the Carolina Trace subdivision in Lee County, had constructed a sewer connection between its original wastewater treatment plant and the City of Sanford's plant to supplement CTC's plant; CTC constructed a new treatment plant and did not subsequently divert any sewage through the connection to Sanford; and CTC included the full cost of the connection in its rate base, contending that this was still plant that was used and useful. There is no evidence in the record that the connection has become obsolete, lost its usefulness, or otherwise reached a condition indicating that it has been or should be classified as retired plant. The designation of unused but usable physical plant as "property retirement" and treating it as "reasonable operating expenses" by allowing its amortization is simply to create a fiction within N.C.G.S. § 62-133(b) and denies the fundamental logic of the ratemaking formula. Clearly the construction of this sewer connection, unlike ongoing, "operating" expenses, was a one time capital investment that can be capitalized in the rate base when it becomes used in service to the public. Only such "operating expenses" which are incurred through the providing of service to the consuming public with property used and useful can be considered in the setting of rates for a utility.

**Am Jur 2d, Public Utilities §§ 133, 138-139.**

STATE ex rel. UTILITIES COMMISSION v. PUBLIC STAFF

[333 N.C. 195 (1993)]

2. **Utilities Commission § 32 (NCI3d) — water and sewer service — plant no longer used — extraordinary property retirement — unamortized balance included in rate base**

    The Utilities Commission, having erred by ordering that a currently unused connection to another sewage system be treated as extraordinary property retirement and amortized, further erred by directing that the unamortized balance be included in the rate base. The Commission has simultaneously treated the unused property as rate base and as reasonable operating expenses in direct violation of the ratemaking process.

**Am Jur 2d, Public Utilities §§ 133, 138-139.**

3. **Utilities Commission § 35 (NCI3d) — water and sewer service — rate base — excess capacity**

    The Utilities Commission erred in its determination of the appropriate "capacity allowance" (reserve plant capacity for future growth) in the rate base of a portion of a new sewage treatment plant not presently in service but held for future use. The Commission was correct in rejecting the position of the Public Staff that a utility's plant investment in service capacity should be exactly equal to current customer demand, i.e., no capacity allowance. However, it was error for the Commission to accept the Division of Environmental Management's design criteria as the actual plant capacity currently needed and the beginning point for determining appropriate additional capacity allowance, rather than making its own determination upon the evidence before it. Furthermore, the Commission erred by changing its methodology and matching revenues from present customers with the cost of plant built to serve both present customers and additional future customers.

**Am Jur 2d, Public Utilities §§ 133, 138-139.**

    On direct appeal as of right pursuant to N.C.G.S. §§ 62-90(d) and 7A-29(b) from a final order of the North Carolina Utilities Commission entered 31 May 1991 in Docket No. W-436, Sub 4. Heard in the Supreme Court on 10 March 1992.

*Hunton & Williams, by Edward S. Finley, Jr., for applicant-appellee.*

*Public Staff Legal Division, by David T. Drooz, Staff Attorney, for intervenor-appellant.*

STATE EX REL. UTILITIES COMMISSION v. PUBLIC STAFF

[333 N.C. 195 (1993)]

LAKE, Justice.

This is a public utility general rate case on direct appeal by the Public Staff of the North Carolina Utilities Commission from a final decision of the Commission awarding an increase in rates to be charged by Carolina Trace Corporation (CTC) to the consuming public which it serves. The assignments of error raised present important, fundamental principles of ratemaking law and policy under the limited authority delegated to our Utilities Commission by the General Assembly pursuant to the Public Utilities Act, Chapter 62 of the General Statutes.

The basic question presented is whether a public utility company may lawfully recover, through rates charged its customers, either its investment cost in or a profit on its property which is not presently used or useful in its service to its customers, under the standards and requirements specified in the substantive, controlling ratemaking section of the Act, N.C.G.S. § 62-133(b). Specifically, the issues raised include: (1) whether the investment cost of utility plant that is not "used and useful" in the public service may be treated in effect as "reasonable operating expenses" and recovered in part through amortization; (2) whether the unamortized portion of such plant may be recovered, along with a return or profit thereon, by including such portion in the company's rate base; and (3) the appropriate capacity allowance in the rate base of plant which is not presently in service to the public but is held for future use.

The record reflects that on 28 June 1990 CTC, a public utility that provides water and sewer services in the Carolina Trace subdivision in Lee County, North Carolina, filed application with the Utilities Commission for increase in its rates for both its water and sewer operations. The Commission declared this a general rate case and scheduled the matter for evidentiary hearing which commenced on 14 November 1990 before a hearing examiner, whose recommended order approving rates was issued on 21 March 1991. The Public Staff appealed the recommended order to the full Commission which then issued the final order approving increased rates on 31 May 1991. The Public Staff filed exceptions and notice of appeal of this final order on 28 June 1991.

The first two issues raised relate to a contract between CTC and the City of Sanford and CTC's construction pursuant thereto of a sewer connection between its original wastewater treatment

plant and the City of Sanford's plant to supplement CTC's plant and system by use of Sanford's treatment capacity. This interconnection with Sanford was installed in 1983 at a net investment cost to CTC of $89,722. On 7 December 1989 CTC put a new wastewater treatment facility with a capacity of 325,000 gallons per day into operation. The old plant had a capacity of 150,000 gallons per day. After April of 1990 CTC treated all of its sewage at its new treatment plant and did not divert any sewage through the connection to Sanford. However, in its June 1990 application, CTC included the full cost of the connection in its rate base, contending this was still plant that was "used and useful" under the statute. The Public Staff contended this connection was at most plant held for future use and should be excluded from rate base. The Commission rejected both of these opposing contentions, with the hearing examiner holding the connection should be treated "as abandoned plant" and the Commission holding it should be treated as "extraordinary property retirement." Both held the cost should be amortized over a six-year period, with the unamortized balance included in rate base.

The third issue relates to how much of the cost of the *new* sewage treatment plant should be included in the rate base under the "used and useful" statutory standard. Although the CTC evidence showed that 281,160 gallons per day of capacity would meet the Division of Environmental Management design standards for existing customers, or 86.5% of the 325,000 gallons per day total capacity, CTC contended the entire cost of the new plant ($439,024) should be allowed in the rate base. The Public Staff contended that only 48% of the plant cost should go in the rate base because its evidence showed only 48% of the total capacity (155,000 gallons per day) was actually needed and used to serve existing customers. The hearing examiner added 15,344 gallons per day to the CTC evidence standard of 281,160 gallons by calculating a "reasonable capacity allowance of thirty-five percent" to conclude that 91.23% or $400,522 should go into rate base. The Commission in its final order found that a 281,160 gallon capacity was required to serve existing customers under design standards, and further found that a "capacity allowance" for future growth should be added. In determining the capacity allowance for future growth, the Commission concluded CTC had a 7% annual growth rate and that a two year planning horizon was reasonable. The Commission then calculated 39,362 gallons of margin should be added to the 281,160 deemed

necessary and useful capacity for existing customers, resulting in an allowance of 98.62%, or $432,967 of the $439,024 total cost, into the rate base.

## I.

[1]  In reviewing the propriety of the Commission's findings and conclusions, specifically its determination that an investment cost in physical plant that is not "used and useful" (and thus not includable in rate base) should be charged to expense and recovered through amortization as an "extraordinary property retirement," we consider whether the Commission's order is affected by errors of law and "whether there is substantial evidence, in view of the entire record, to support the position adopted." *State ex rel. Utilities Commission v. Thornburg*, 325 N.C. 484, 492, 385 S.E.2d 463, 467 (1989). With regard to the law "the Commission must . . . comply with the requirements of [N.C.G.S. Chapter 62], more specifically, G.S. 62-133." *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 336, 189 S.E.2d 705, 717 (1972). Upon such review, we find the classification of the physical plant here in question as "extraordinary property retirement" and subject to recovery through amortization, to be extraordinary indeed, as there is neither legal basis nor any fact or evidence to support it.

Turning first to the evidentiary record, CTC contended and offered testimony through its main witness that the connection was currently used and useful and that he expected it to be used in the near future. While the record as a whole shows abundant, substantial evidence that the sewer connection may be used and useful in the future, there is no evidence in the record that the connection has become obsolete, has lost its usefulness, or has otherwise reached a condition indicating it has been or should be classified as "retired plant." Both the record evidence and the detailed findings in the Commission's order itself expressly show the possible use or usefulness of this sewer connection in the future. The Commission's order in this regard held:

The Commission concludes that the cost of the connection to Sanford should not be included in plant in service. The new treatment plant was built with some additional capacity that is not required for today's customers, and it has an equalization chamber that should be capable of smoothing peak flows. The connection to Sanford has not been used since April of 1990. There is no contractual basis and no clear certainty that

Sanford will accept wastewater from Carolina Trace for treatment in the future. It is not reasonable that the customers of Carolina Trace should pay higher rates for this interconnection just so their utility can have a backup system that other utilities are able to exist without. It is possible that the connection to Sanford will be useful to Carolina Trace in some future year as the subdivision grows and as the City of Sanford becomes more able to take outside wastewater, but for the present the interconnection between Sanford and Carolina Trace is not used and useful to the ratepayers.

There is no question, however, that the connection has been used and useful for utility service in the past. The connection was needed to supplement the capacity of the Company's then existing 150,000 gallons per day plant. The sewage for Carolina Trace could not have been treated in any other way. Although the Commission has found and concluded that the connection is no longer used and useful, the Commission is of the opinion that the connection should be treated as extraordinary property retirement and amortized over a six-year period, with the unamortized balance included in rate base. In this way the Company will be allowed to recover its investment in plant that at one time was used and useful to provide service. [Emphasis added.]

The Commission's conclusion that "the connection should be treated as extraordinary property retirement" is not supported by competent, material and substantial evidence in view of the entire record and, in fact, is inconsistent with its finding that "(i)t is possible that the connection to Sanford will be useful to Carolina Trace in some future year . . . ."

With respect to the legal basis, the designation of unused but usable physical plant as "property retirement" and treating it as "reasonable operating expenses" by allowing its amortization is simply to create a fiction within N.C.G.S. § 62-133(b). Any such treatment denies the fundamental logic of the ratemaking formula of N.C.G.S. § 62-133(b), including the obvious nexus between "reasonable operating expenses" and plant "used and useful" in providing service. Clearly the construction of this sewer connection, unlike on-going, "operating" expenses, was a one time capital investment that can be capitalized in the rate base when it becomes

STATE ex rel. UTILITIES COMMISSION v. PUBLIC STAFF

[333 N.C. 195 (1993)]

used in service to the public. CTC, like any utility company, could have elected to employ this correct approach at any time since the 1983 completion of this plant investment by the relatively simple process of filing an application with the Commission.

The clear wording of N.C.G.S. § 62-133(b) requires the Commission to determine the utility's rate base (RB) (the reasonable cost of its property used and useful in service to the public, *less* accumulated depreciation plus reasonable cost of construction work in progress), its reasonable operating expenses (OE), and a fair rate of return on the company's capital investment (RR). These three components are then combined in a formula expressed as follows: (RB × RR) + OE = Revenue Requirements. "Operating expenses generally include costs for fuel, wages and salaries, and maintenance, as well as annual depreciation charges and taxes. . . . The rate of return is a percentage multiplier applied to the rate base to produce the amount of money the Commission concludes should be earned by the utility, over and above its reasonable operating expenses." *State ex rel. Utilities Commission v. Thornburg*, 325 N.C. 463, 467 n.2, 385 S.E.2d 451, 466 n.2 (1989). *See generally* C.F. Phillips, Jr., *The Regulation of Public Utilities* 332 and 229 (1984).

It is fundamental under our ratemaking statute and formula that the "reasonable operating expenses," specified in N.C.G.S. § 62-133(b)(3) and (5), relate and must be directly connected to "the reasonable original cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period," as specified in subsection (b)(1). N.C.G.S. § 62-133(b)(1) (1989). Only such "operating expenses" which are incurred through the providing of service to the consuming public with property "used and useful" can be considered in the setting of rates for a utility. *State ex rel. Utilities Comm. v. Nantahala Power & Light Co.*, 313 N.C. 614, 332 S.E.2d 397 (1985), *rev'd on other grounds*, 476 U.S. 953, 90 L. Ed. 2d 943 (1987).

The relationship between "reasonable operating expenses" (N.C.G.S. § 62-133(b)(3)) and the rate base consisting of property which must be "used and useful" (N.C.G.S. § 62-133(b)(1)) is unequivocally established by the encompassing language of the last stage of the ratemaking process—subdivision (5) of the statute, which states:

Fix such rates to be charged by the public utility as will earn in addition to reasonable operating expenses ascertained pursuant to subdivision (3) of this subsection the rate of return fixed pursuant to subdivisions (4) and (4a) on the cost of the public utility's property ascertained pursuant to subdivision (1).

N.C.G.S. § 62-133(b)(5) (1989).

Further, it is apparent that under the Commission's approach, in the event the sewer connection here involved does become used and useful in the future, CTC's current ratepayers will have already paid for "retirement" of this plant within seven years, a result certainly not intended or allowed under our law. The Commission's order must be reversed in this regard.

## II.

[2] After finding the Sanford sewer connection to be "no longer used and useful" and concluding thereupon that it should be treated as extraordinary property retirement and amortized over a six-year period, the Commission then compounds this error of law by directing the "unamortized balance" to be "included in rate base." The Commission then states in its order: "In this way the Company will be allowed to recover its investment in plant that at one time was used and useful to provide service."

In actuality, "in this way" the Company will be allowed to recover substantially more than its investment in plant. Certainly, CTC will be allowed to recover (albeit improperly) through amortization its investment in this plant which is not used or useful, and, additionally, under the ratemaking formula, with this provision CTC will be able to earn the "rate of return" or profit allowed by the Commission on any portion of this unused plant that is included in the rate base. The Commission has simultaneously treated this unused property as rate base and reasonable operating expenses. This is a direct violation of the ratemaking process. There is no statutory authority anywhere within Chapter 62 that permits the Commission to include in rate base any completed plant (as opposed to construction work in progress) that is not "used and useful" within the meaning of this term as determined by our case law. This Court has stated with regard to N.C.G.S. § 62-133(b)(5):

While this statute makes clear that the rates to be charged by the public utility allow a return on the cost of the utility's property which is used and useful within the meaning of N.C.G.S.

§ 62-133(b)(1), the statute permits recovery but no return on the reasonable operating expenses ascertained pursuant to subdivision (3).

*State ex rel. Utilities Commission v. Thornburg*, 325 N.C. at 475, 385 S.E.2d at 458 (emphasis added).

The Commission's order with respect to this provision must be reversed.

III.

[3] The third issue raised involves the determination of the appropriate "capacity allowance" (or reserve plant capacity for future growth) in the rate base of that portion of CTC's new treatment plant that is not presently in service but is held for future use. This issue (frequently referred to as a question of "excess capacity" in rate base) generally involves the striking of an appropriate balance between the rate burdens to be borne by current and future customers for that portion of the plant not presently used but allowed in the rate base as appropriate reserve for future growth. As always, our review of this issue on appeal is limited to whether the Commission correctly followed requisite guidelines specified in N.C.G.S. § 62-133(b) and based its determination on competent, material and substantial evidence in light of the entire record.

As noted above, there is a wide disparity in the positions of CTC and the Public Staff. CTC contends the entire cost of the new plant should be in the rate base even though only 86.5% of total capacity was needed to serve current customers under the Division of Environmental Management (DEM) design standards. The Public Staff contends only 48% should go into rate base since its evidence showed only 48% of total capacity was actually being used by current customers, its position being that under proper construction of the statute the capacity allowance should always be equal to the current customer demand. The Commission rejected, out of hand, this position of the Public Staff and adopted, as its starting point for current usage the design criteria of DEM, concluding that "[t]he design criteria of this State agency should be accorded great weight by the Commission in determining the amount of plant to be included in rate base." The Commission then adopted a methodology different from that used by the hearing examiner, and previously used by the Commission, to conclude

that CTC should be allowed virtually all of the new plant cost (98.62%) in the rate base.

At the outset, we agree the Commission was correct in rejecting as too rigid the position of the Public Staff that a utility's plant investment in service capacity should be exactly equal to current customer demand, i.e., no capacity allowance. The position of the Public Staff is not in accord with our previous decisions on this issue. Accordingly, we consider now the standards and methodology apparently employed by the Commission. The Commission, in support of its findings and conclusions, sets forth in its order portions of this Court's decision in *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E.2d 705, the leading case on ratemaking theory, particularly with respect to this issue. In speaking on this issue, Justice Lake, Sr. set forth the following relevant, fundamental principles:

> The question for determination in connection with an alleged overbuilding of the utility plant is whether the properties in question can be deemed "used and useful" in rendering the service, as of the end of the test period. If not, they may not properly be included in the rate base. G.S. 62-133; *Utilities Commission v. Morgan, Attorney General, supra*, at p. 268; *Utilities Commission v. Gas Co.*, 254 N.C. 536, 548, 119 S.E.2d 469. As the Supreme Court of Oregon said, in *Pacific Telephone & Telegraph Co. v. Wallace*, 158 Ore. 210, 231, 75 P.2d 942, 951:
>
> > "We are well satisfied that the company cannot include within its valuations property which it neither used nor was useful to the public service. Property which was not reasonably necessary to the adequate furnishing of telephone service must be excluded from the rate base."
>
> Similarly, in *St. Joseph Stockyards Co. v. United States*, 11 F. Supp. 322, 329 (W.D. Mo.), *aff'd*, 298 U.S. 38, 56 S. Ct. 720, 80 L. Ed. 1033, the Court said:
>
> > "The matter of including or excluding land or property held for business expansion in the rate base is the matter of who—the ratepayers or the company—shall carry property which is not being used to produce the service paid for by the rate. Obviously, it may be proper and good business judgment may sometimes dictate provision for future expansion of the business. It is equally clear

STATE ex rel. UTILITIES COMMISSION v. PUBLIC STAFF

[333 N.C. 195 (1993)]

that, so far as the present ratepayers are concerned, there must be a limit to the extent to which they can be compelled to pay for providing possible future facilities for future business. While a broad power and discretion must be left undisturbed in company management, yet, even as to expenditures directly entering into the present service for which the now customer pays, this discretion is not beyond control. [Citations omitted.] It would seem that such control should be much more extensive where the expenditure has no part whatsoever in furnishing the service paid for. In fact, the general doctrine is that the rate base is made up of values used in furnishing the service."

Justice Holmes, speaking for the Court in *San Diego Land & Town Co. v. Jasper*, 189 U.S. 439, 446, 23 S. Ct. 571, 47 L. Ed. 892, said:

"If a plant is built * * * for a larger area than it finds itself able to supply, or, apart from that, if it does not, as yet, have the customers contemplated, neither justice nor the Constitution requires that, say, two-thirds of the contemplated number should pay a full return."

At the time he so spoke, the Supreme Court of the United States followed the view that the Federal Constitution required regulatory commissions to comply with the rule of *Smyth v. Ames*, 169 U.S. 466, 18 S. Ct. 418, 42 L. Ed. 819, from which G.S. 62-133 is derived.

Justice Cardozo, speaking for the Court in *Columbus Gas & Fuel Co. v. Public Utilities Commission*, 292 U.S. 398, 407, 54 S. Ct. 763, 78 L. Ed. 1327, said:

"[Certain gas leases purchased by the utility] ought not in fairness to be capitalized until present or imminent need for use as sources of supply shall have brought them into the base upon which profits must be earned. To capitalize them sooner is to build the rate structure of the business upon assets held in idleness to abide the uses of the future."

To the same effect are: *Cedar Rapids Gaslight Co. v. City of Cedar Rapids*, 144 Iowa 426, 120 N.W. 966, 969, and *Public Service Commission v. Montana-Dakota Utilities Co. (N.D.)*, 100 N.W.2d 140, 150.

STATE EX REL. UTILITIES COMMISSION v. PUBLIC STAFF

[333 N.C. 195 (1993)]

On the other hand, a public utility is under a present duty to anticipate, within reason, demands to be made upon it for service in the near future. *Idaho Underground Water Users Association v. Idaho Power Co.*, 89 Idaho 147, 404 P.2d 859; *Wisconsin Telephone Co. v. Public Service Commission*, 232 Wis. 274, 343, 287 N.W. 122. Substantial latitude must be allowed the directors of the utility in making the determination as to what plant is presently required to meet the service demand of the immediate future, since construction to meet such demand is time consuming and piecemeal construction programs are wasteful and not in the best interests of either the ratepayers or the stockholders. *Springfield v. Springfield Gas & Electric Co.*, 291 Ill. 209, 234, 125 N.E. 891, 901; *Latourneau v. Citizens' Utilities Co.*, 125 Vt. 38, 209 A.2d 307; *Pacific Telephone & Telegraph Co. v. Department of Public Service*, 19 Wash. 2d 200, 142 P.2d 498; *Wisconsin Telephone Co. v. Public Service Commission, supra*; 73 C.J.S., *Public Utilities*, 18a. However, Commission action deleting excess plant from the rate base is not precluded by a showing that present acquisition or construction is in the best interests of the stockholders. The present ratepayers may not be required to pay excessive rates for service to provide a return on property which will not be needed in providing utility service within the reasonable future.

. . . .

The question of whether specific property is presently "used and useful" in rendering service is one of fact to be determined by the Commission upon competent and substantial evidence. *Southern New England Telephone Co. v. Public Utilities Commission*, 29 Conn. Super. 253, 282 A.2d 915, 919; *Latourneau v. Citizens Utilities Co., supra*. On this question, the burden of proof is upon the utility to show that the property should be included in its rate base, for it has the burden of showing that its proposed increase in rates is just and reasonable. G.S. 62-75; G.S. 62-134(c).

*Utilities Comm. v. Telephone Co.*, 281 N.C. at 351-54, 189 S.E.2d at 726-28 (emphasis added).

While we have agreed with the Commission's rejection of the Public Staff's position of no capacity allowance or reserve for future

growth as being too restrictive and inconsistent with the above principles of ratemaking, we do not agree with the Commission's apparent carte blanche sanction of the design criteria of DEM as a substitute for its own determination of the actual current use capacity of the plant—the starting point for determining how much additional capacity allowance or reserve for future growth is appropriate as "used and useful" property in the rate base. Certainly the DEM's design criteria must not simply replace the Commission's own determination of "the amount of plant to be included in rate base."

While the opinions and criteria of the DEM, in terms of our environment, are indeed of great importance and should be considered by the Commission and even "accorded great weight" by any utility company management in the planning and operation of its business, the determination of what is required of a utility company or any company under law in terms of the environment is one thing, and the determination of what is required of a utility company under law in terms of rate base and ratemaking is quite another. The latter is the exclusive responsibility of the Utilities Commission.

> [T]he Legislature has conferred upon the Utilities Commission the power to police the operations of the utility company so as to require it to render service of good quality at charges which are reasonable. G.S. 62-31; G.S. 62-32; G.S. 62-130; and G.S. 62-131. These statutes confer upon the Commission, not upon this Court or the Court of Appeals, the authority to determine the adequacy of the utility's service and the rates to be charged therefor.

*Utilities Comm. v. Telephone Co.*, 281 N.C. at 335-36, 189 S.E.2d at 717 (citations omitted).

Accordingly, we conclude it was error for the Commission to arbitrarily or subserviently accept, in place of its own determination upon the evidence before it, the DEM's design criteria of 281,160 gallons per day as the actual plant capacity currently needed for service to existing customers—and the beginning point for determining the appropriate additional "capacity allowance."

Further, we note the Commission, as it emphasizes in its order, has changed its methodology in this case from that previously employed (*State ex rel. Utilities Comm. v. Carolina Water Service*,

STATE ex rel. UTILITIES COMMISSION v. PUBLIC STAFF

[333 N.C. 195 (1993)]

328 N.C. 299, 401 S.E.2d 353 (1991)) and employed in this case by the hearing examiner. The Commission states in its order:

> The Hearing Examiner in reaching his decision in this regard found and concluded that a plant capacity allowance of 35 percent of that portion of the design capacity of the Company's new wastewater treatment plant *not fully utilized in serving existing customers* at the end of the test year . . . [was] properly includable in determining the Company's cost of service . . . .
>
> However, the Commission believes that the proper allowance, based on the evidence in this case, for such required plant capacity is an amount equal to 14 percent of that portion of the subject plant facilities *that are being fully utilized in providing service to existing customers* as opposed to the allowance employed in the Recommended Order. This determination is based upon the Commission having concluded that in order to achieve economic efficiency certain plant facilities cannot be constructed on a piecemeal basis; . . . that a planning horizon of two years is appropriate for use in this proceeding for this purpose; . . . and that the inclusion of an allowance for such required plant capacity in determining the Company's cost of service or overall revenue requirement achieves the most propitious matching of revenues and costs . . . . [Emphasis added.]

This change in methodology appears to reflect an approach to matching of revenues and costs of plant in rate base different from that employed by the Commission in *State ex rel. Utilities Comm. v. Carolina Water Service.* In that case the Commission declined to allow a substantial portion of plant requested into rate base partially because the company failed to show how much revenue would be produced by the additional plant that became used and useful after the test period, resulting in a mismatch of historical revenues and costs of future plant. This Court in that case upheld the Commission's approach to matching stating:

> Matching requires that *future revenues* and expenses be matched with the part of the cost of a plant put in the rate base which is to *serve future customers.* Its purpose is to prevent *present customers* from paying for that portion of a plant that will serve only *future customers.*

*State ex rel. Utilities Comm. v. Carolina Water Service*, 328 N.C. at 304, 401 S.E.2d at 355 (emphasis added). The order in the instant case appears to match revenues from present customers with the cost of plant built to serve both present customers and additional future customers. Thus, the order in the case *sub judice* does not comport in this regard to approved practice and must be reversed and this case remanded for adjustment of revenues on a *pro forma* basis for whatever "capacity allowance" is then determined appropriate under the "used and useful" standard.

Accordingly, upon the foregoing as to each of the issues presented, the order of the Commission is reversed and this case is remanded for proceedings consistent with this opinion.

REVERSED AND REMANDED.