BENTON, Judge.
Florida Cities Water Company (Florida Cities) appeals a rate order in which the Public Service Commission (PSC) disallowed approximately 2.4 million dollars that Florida Cities sought to include in its rate base. Florida Cities contends that the PSC overstated the capacity of Florida Cities’s North Fort Myers Advanced Wastewater Treatment Plant, then used a novel method — without explaining the shift in methodology — to determine that less than two-thirds (65.9 percent) of the total investment Florida Cities had made in the plant was “used and useful.” § 367.081(2)(a), Fla. Stat. (1995). We find these contentions meritorious and reverse for further proceedings before the PSC. But we reject Florida Cities’s additional contention that everything it invested to comply with environmental regulations must automatically be included in its rate base.

Prior Ratemaking Proceeding

Florida Cities initiated an earlier ratemak-ing case in connection with the same waste-water treatment plant, which was assigned Docket No. 910756-SU. At issue in that docket was whether Florida Cities could increase its rate base to reflect moneys expended in upgrading its North Fort Myers plant to an advanced wastewater treatment facility. The upgrade took place in conformity with a consent order entered by the Florida Department of Environmental Regulation (DER). The PSC allowed all of the expenses incurred in upgrading the plant as additions to the rate base, and determined a. total rate base of $6,343,868.
In Docket No. 910756-SU, the PSC concluded that the entirety of the advanced wastewater treatment plant was “used and useful,” before deciding that all the money spent upgrading it should be included in the 1992 rate base. Preliminarily, the PSC determined that the plant’s treatment capacity was one million gallons per day (1.0 MGD). As is customary, the PSC rated treatment capacity in terms of the average daily flow of wastewater over a year’s time. Taking into account seasonal variations in demand, the *622 PSC gauged the need for treatment capacity by calculating a peak month daily average flow. The PSC credited evidence that the average daily flow in peak months exceeded 1.0 MGD and concluded on that basis that no part of the plant represented excess capacity, i.e., that the plant was one hundred percent “used and useful.”

Additional Capacity

On January 2, 1992, Florida Cities submitted a “capacity analysis report” to DER. In November of 1991, DER had informed Florida Cities that, because operating reports showed that the utility had exceeded its permitted capacity of 1.0 MGD in each of three consecutive months, Florida Administrative Code Rule 17-600.405 required Florida Cities to submit a capacity analysis report.
After reviewing Florida Cities’s report, DER — to whose responsibilities the Florida Department of Environmental Protection (DEP) has since succeeded — informed Florida Cities that it needed to submit “documentation of timely planning, design and construction of needed expansions in accordance with Florida Administrative Code Rule 17-600.405(8),” now codified as Florida Administrative Code Rule 62-600.405(8).
Florida Cities furnished DEP the required documentation, and in September of 1998 applied for a construction permit to increase the North Fort Myers plant’s treatment capacity to 1.5 MGD. DEP issued a construction permit authorizing the requested expansion on June 2, 1994. Before construction began, however, the utility directed the design engineers to scale back the project by reducing the design treatment capacity to 1.25 MGD, instead of the permitted 1.5 MGD originally contemplated.

The Present Proceeding

In May of 1995, while construction was under way, Florida Cities filed an application for a rate increase, asking the PSC to include the costs of ongoing plant expansion and certain plant improvements in the rate base, raising the total rate base to $8,404,278. When the final numbers were in, the utility requested a $1,768,689 addition to the rate base, $1,611,673 of which was identified as the cost of expanding and upgrading to meet environmental regulatory requirements.
In due course, the PSC issued a Notice of Proposed Agency Action Order Granting Final Rates and Charges on November 2,1995, reciting in effect that the plant expansion was one hundred per cent “used and useful” and proposing to include all of the construction costs in the rate base, which would have resulted in a rate increase of 17.89 percent. The Office of Public Counsel, as well as individual Florida Cities customers, challenged this proposed agency action and a hearing ensued.
Ultimately, the PSC entered the final order under review, reducing rather than increasing rates. In its final order, the PSC reduced the rate base by almost $800,000, leaving a rate báse of $5,525,915. The PSC did not question the reasonableness of the plant expansion costs or of the amounts expended for improvements but, considering the expanded and improved plant as a whole, recalculated the “used and useful” portion of the plant as only 65.9 percent. This recalculation assumed the accuracy of the PSC’s finding that the expanded plant’s treatment capacity was the 1.5 MGD permitted, not the 1.25 MGD treatment capacity actually designed and built.
The PSC also changed the method it used to calculate a used and useful percentage. In the 1992 rate case, the PSC made the average daily flow calculated on a peak month basis the numerator of a fraction whose denominator was the plant’s treatment capacity (stated in terms of average daily flow over a year’s time.) Since the fraction was greater than one, the PSC did not reach the question of a margin reserve. In the present case, the PSC changed the way it arrived at the numerator: Instead of using the average daily flow calculated on a peak month basis, it used the average daily flow calculated on an annual basis (to which it added a “reserve” of 4.58 percent), so reducing the used and useful percentage (addition of the reserve notwithstanding).

Recovery Of Expenses Incurred In Complying With Environmental Regulations

We first consider Florida Cities’s contention that the PSC was required to include *623 in the rate base all moneys Florida Cities had to spend in order to comply with environmental regulations. We must decide whether capital expenditures that a utility makes in order to meet state (or federal) environmental (or other) governmental requirements [1] must ipso facto be included in the utility’s rate base. Finding no controlling Florida precedent, we hold that the PSC must, in considering what to include[2] in the rate base, treat capital improvements required by governmental regulations as “in the public interest,” § 367.081(2)(a), Fla. Stat. (1995), but that the PSC must add these expenditures to the rate base only to the extent the improvements they effect or the facilities to which they relate .are “used and useful in the public service.” Id.
“The commission shall ... consider the investment of the utility in land acquired or facilities constructed or to be constructed in the public interest within a reasonable time in the future_” § 367.081(2)(a), Fla. Stat. (1995). Capital expenditures necessary to comply with governmental regulations must be “considered” because they are “in the public interest.” But utilities are entitled to a fair return only “on the investment of the utility in property used and useful in the public service.” Id. Capital expenditures not “used and useful” at present are properly excluded from the rate base, even though reasonably incurred in the public interest. While such expenditures are presumably a proper basis for an allowance for funds prudently invested, no such allowance was requested in the present case.
To require the PSC to add to the rate base any and all expenditures another governmental agency’s regulations require a utility to make, without regard to whether the expenditures are “used and useful” for current customers, would in effect transfer ratemaking authority from the PSC to the governmental agency requiring the expenditures. Like the North Carolina Supreme Court, we reject such an approach.
While the opinions and criteria of the [North Carolina Department of Environmental Management (DEM) ], in terms of our environment, are indeed of great importance and should be considered by the Commission and even “accorded great weight” by any utility company management in the planning and operation of its business, the determination of what’ is required of a utility company or any company under law in terms of the environment is one thing, and the determination of what is required of a utility company under law in terms of rate base and ratemaking is quite another. The latter is the exclusive responsibility of the Utilities Commission.
[[Image here]]
Accordingly, we conclude that it was error for the Commission to arbitrarily or subserviently accept, in place of its own determination upon the evidence before it, the DEM’s design criteria of 281,160 gallons per day as the actual plant capacity currently needed for service to existing customers ....
State ex rel. Utils. Comm’n v. Public Staff-North Carolina Utils. Comm’n, 333 N.C. 195, 424 S.E.2d 133, 140 (1993)(reversing rate-making in which utilities commission did not determine for itself what portion of expansion required by environmental agency was “used and useful”). Even when another governmental agency has required a utility to make a capital expenditure, the PSC must *624 decide what portion of the expenditure (if any) belongs in the utility’s rate base.
Although we reject Florida Cities’s contention that all capital expenditures a utility makes in order to comply with governmental' regulations must necessarily be included in its rate base, this contention does find support in an earlier PSC decision:
The staff engineer has concluded that, with the exception of the sewage treatment plant, all of Kingsley’s facilities are 100% used and useful. The sewage treatment plant was found to be 74% used and useful. On the basis of this finding the staff recommended a negative adjustment to the rate base for the sewage treatment plant of $393,522.
We do not believe that the staffs proposed used and useful adjustment would be proper in this case. The expansion of the Kingsley treatment facility was required by the Department of Environmental Regulation, and we do not believe the utility should be penalized for expanding beyond current customer needs where a governmental agency has required it to do so in the public interest.
In Re: Application of Kingsley Serv. Co., 84 F.P.S.C. 3:184, 186 (1984). While “an agency’s interpretation of a statute it is charged with enforcing is entitled to great deference and will be approved by this Court if it is not clearly erroneous,” Florida Interexchange Carriers Ass’n (“FICA”) v. Clark, 678 So.2d 1267, 1270 (Fla.1996), the PSC has itself turned its back on its Kingsley Service Company precedent.
After handing down the Kingsley Service Company decision, the PSC adopted Florida Administrative Code Rule 25-30.434, making possible a return on funds prudently invested without including them in the rate base.[3] Promulgation of Florida Administrative Code Rule 25-30.434 was an appropriate occasion for the PSC’s altering the policy it had enunciated in the Kingsley Service Company case. The new rule allows recognition of all capital expenditures made in the public interest, without requiring that all such expenditures be included in the rate base.

Used And Useful Calculation

The PSC’s conclusions in the present proceeding as to the “used and useful” portion of Florida Cities’s investment in its wastewater treatment plant[4] cannot be reconciled with the PSC’s conclusions on this point in the prior proceeding (Docket No. 910756-SU) concerning the same plant. Conceding at oral argument in the present case that the PSC had never before used the average annual daily flow as the numerator in calculating a “used and useful” percentage for any plant, PSC’s counsel insisted that this innovation ‘ did not represent a change in policy:
THE COURT: We had a little switch here, right, between the 1992 proceeding and this proceeding, in the way that [the “used and useful” percentage] was calculated?
COUNSEL: That is correct.
THE COURT: And that is forthrightly acknowledged in the order. Is there anything in the order that explains that change ... going from the average peak month day to the average annual day?
COUNSEL: No, sir. The order states that (unintelligible) ... they have found a miscalculation, they would no longer use mismatched flows of the average annual daily flow with the average maximum month. If you use the average maximum month, that results in a measurement that is different than the measurement of the average annual daily flow.
THE COURT: All right, so then this has been a longstanding practice that the *625 Commission abandoned for the first time in this case?
COUNSEL: That is correct.
THE COURT: So at the very minimum then, why shouldn’t this ease be remanded for an explanation if nothing else?
COUNSEL: The Commission believes that it’s not a policy change, it is simply a finding similar to if the Commission had been doing a miscalculation — where if the Commission had been adding 2+2=5 all along, also recognized that 2+2=4, that they should be able to undo that calculation without — that it’s not a policy change, and there doesn’t seem to be any requirement in the APA to ignore common sense to deal with miscalculation.
THE COURT: But now this so-called “miscalculation” recurred repeatedly in numerous cases over several years?
COUNSEL: Yes sir, that is correct_'
But, in an order the PSC entered on February 25, 1997, denying a motion for rehearing of an order entered on September 12,1996— two days after the final order entered in the present ease — the PSC identified the matter as an issue of “Commission policy”:
The used and useful calculation must be concerned with the maximum flows the treatment plant may experience in order to allow for that event....
... Therefore, consistent with Commission policy, and since this utility is subject to severe seasonal fluctuations, we calculated the used and useful percent for the treatment plant using maximum month average daily flows ....
[[Image here]]
[The Office of Public Counsel] argues that the Commission erred in using the maximum month average daily flow to determine the pre-AWT used and useful percentage, stating that it is inconsistent with Order No. PSC-96-1133-FOF-SU, issued September 10,1996, in Docket No. 950387-SU [the order now under review]. We disagree with the OPC; each ease stands on its own merit and is based on the evidence in the record.
Since this utility is subject to unusual seasonal flow variations and must be equipped to treat them, we have utilized the maximum month average daily flows in our calculation of the used and useful percentage for the wastewater treatment plant.
In re Application of Florida Cities Water Co. (Barefoot Bay Division), 97 F.P.S.C. 2:561, 566-68 (1997). See also In re Application of Heartland Utils., Inc., 96 F.P.S.C. 11:268, 273 (1996)(using “highest five day average” as numerator). Counsel’s protestations notwithstanding, the PSC’s decision not to use the average daily flow for the peak month in calculating the used and useful percentage in the present case was no mere correction of a mathematical “miscalculation.”
Disregarding the peak month average and substituting the lower annual average daily flow figures reflected a considered break with agency policy. In making the change, the PSC acted inconsistently with its published regulatory philosophy. See In re Petition of Sailfish Point Util. Corp., 91 F.P.S.C. 9:332, 345 (1991)(cited for its used and useful proposition in PSC Digest of Commission Regulatory Philosophies as Expressed in Ratemaking Proceedings and Current Decisions, Division of Water and Wastewater, Rev. 2/95, p. III-45, under the heading “HI Rate Base, H. Plant Held for Future Use, Used and Useful, Current Policy”). No newly promulgated rule necessitated, authorized, or justified such a policy change.
The use of average daily flow in the maximum month to calculate how much treatment capacity is “used and useful” in a wastewater rate case had been repeatedly articulated as the PSC’s policy. See In re Application of Indian River Utils., Inc., 96 F.P.S.C. 2:695 (1996); In re Application of Poinciana Utils., Inc., 94 F.P.S.C. 9:349, 353 (1994)(av-erage daily flow during maximum month used to determine wastewater plant used and useful); In re Application of Gen. Dev. Utils., Inc., 93 F.P.S.C. 7:725, 742-744 (1993)(average day demand of the maximum month used to calculate used and useful); In re Application Florida Cities Water Co. (Golden Gate Division), 92 F.P.S.C. 8:270, 291 (1992)(wastewater plant 100% used and useful since it was operating above rated *626 design capacity during maximum flow periods); In re Application of Florida Cities Water Co. (South Ft. Myers Sys.), 92 F.P.S.C. 4:547, 551-552 (1992).
Under section 120.68, Florida Statutes (Supp.1996), remand is required in these circumstances. The statute provides:
(7) The court shall remand a case to the agency for further proceedings consistent with the court’s decision or set aside agency action, as appropriate, when it finds that:
[[Image here]]
(e) The agency’s exercise of discretion was:
[[Image here]]
3. Inconsistent ■ with officially stated agency policy or a prior agency practice, if deviation therefrom is not explained by the agency ....
§ 120.68, Fla. Stat. (Supp.1996). We have held that “agency action which yields inconsistent results based upon similar facts, without reasonable explanation, is improper.” Martin Mem. Hosp. Ass’n v. Dep’t of Health and Rehabilitative Servs., 584 So.2d 39, 40 (Fla. 4th DCA 1991)(citing North Miami Gen. Hosp., Inc. v. Office of Community Med. Facilities, Dep’t of Health and Rehabilitative Servs., 355 So.2d 1272, 1278 (Fla. 1st DCA 1978)).
The last time a “used and useful” percentage was calculated for Florida Cities’s North Fort Myers Advanced Wastewater Treatment Plant, the peak month average daily flow figure was employed. The final order under review acknowledged the change that took place in the present proceeding:
In Docket No. 910756-SU, using the projected test year ended June 30, 1993, the Commission observed that FCWC’s investment would be substantially enlarged when it. completed construction of a 1.0 mgd advanced wastewater treatment plant. In that proceeding, the Commission found that FCWC’s investment was 100 percent used and useful based upon a comparison of average daily flow conditions during a peak month to available capacity. In this proceeding, we are disregarding the peak month measurements and are using annual average daily flow considerations.
Because this policy shift was essentially unsupported “by expert testimony, documentary opinion, or other evidence appropriate to the nature of the issue involved,” Manasota-88, Inc. v. Gardinier, Inc., 481 So.2d 948, 950 (Fla. 1st DCA 1986), the PSC must, on remand, give a reasonable explanation, if it can, supported by record evidence (which all parties must have an opportunity to address) as to why average daily flow in the peak month was ignored.

The Plant’s Treatment Capacity

The other factor accounting for the discrepancy between used and useful percentages in the present proceeding and in the prior proceeding concerning Florida Cities’s North Fort Myers Advanced Wastewa-ter Treatment Plant was the PSC’s determinations of the plant’s treatment capacity. To the extent a determination of treatment capacity is a finding of fact,[5] the finding in the present case lacks substantial record support, the original DEP construction permit notwithstanding. In light of our decision in this regard, we need not reach Florida Cities’s contention that the PSC erred in excluding its proffer of a later letter from DEP dated July 19, 1996, authorizing operation of “the modified 1.25 mgd advanced wastewater treatment plant.”
As its basis for finding plant capacity to be 1.5 MGD, the PSC cited the testimony of two witnesses: Ms. Dismukes and Mr. Shoemaker. Asked how she arrived at a capacity of 1.5 MGD, Ms. Dismukes replied:
According to the Company’s construction and operating permit, the plant was expanded to 1.5 MGD, limited to 1.3 MGD disposal capacity. In essence, the hydraulic rated capacity of the plant is 1.5 MGD, but the plant is limited to disposing of only 1.3 MGD of effluent. Thus, according to *627 the construction and operating, permit, the cost to increase the plant’s capacity is based upon a plant that has the capacity to meet a demand of 1.5 MGD.
Mr. Shoemaker, a witness for the Florida Department of Environmental Protection, testified that:
Based on FDEP files for Waterway Estates, present construction permit number DC36-237227, the entire facility is hydraulically capable of handling 1.5 MGD which is the build out area of the Waterway Estates franchise area. This capacity is currently being limited to 1.3 MGD due to constraints on the disposal capacity for the reuse system.
[[Image here]]
Q And what you’re basing your opinion on at this point is what was submitted to the DEP at the time of the application for the construction permit; is that correct?
A Yes, sir.
Q And you have not considered any information submitted to the DEP since that date?
A No, sir, I haven’t.
In short, the basis for both the opinions of Ms. Dismukes and Mr. Shoemaker was the DEP permitting file and a permit DEP issued to the utility before construction began.
Testimony of Mr. Cummings, the professional engineer who oversaw construction when the plant was enlarged, explained that the capacity of the plant as actually constructed varied from what DEP originally permitted:
Q What was the design capacity of the plant contained in the preliminary design report and FDEP permit application?
A 1.30 million gallons per day (MGD) expandable to 1.5 MGD.
Q On what basis was the plant capacity expansion designed and rated?
A The plant expansion was originally designed to treat 1.30 MGD on an average annual daily flow basis.
Q Did FCWC [Florida Cities] direct you to change the design after the preliminary design report was prepared and the FDEP permit application was filed?
A Yes. FCWC directed us to change the design capacity to a maximum of 1.25 MGD based on the annual average daily flow and the design waste concentration associated with this. flow. ■
[[Image here]]
Q What is the capacity of the facility that was actually constructed by FCWC?
A The plant capacity will be equal to 1.25 MGD based upon the average annual daily flow and the waste concentration associated with this flow.
As the PSC points out in its answer brief, there “is no requirement ... that the Commission must usé the permitted capacity determined by DEP when it; calculates its plant flow capacity.”
“[A] reviewing, court may not substitute its judgment for that of the agency on disputed findings of fact,” Reedy Creek Improvement Dist. v. State Dep’t of Envtl. Regulation, 486 So.2d 642, 648 (Fla. 1st DCA 1986), if substantial competent evidence supports the findings. See Legal Envtl. Assistance Found., Inc. v. Clark, 668 So.2d 982, 987 (Fla.1996)(“When reviewing a Commission’s order, the standard of review is whether there is competent, substantial evidence in the record to support the order.”); Bricker v. Deason, 655 So.2d 1110, 1111 (Fla.1995); Fort Pierce Util. Auth. v. Beard, 626 So.2d 1356 (Fla.1993); Polk County v. Florida Pub. Serv. Comm’n, 460 So.2d 370, 373 (Fla.1984). But here, when viewed in light of the whole record, no competent evidence of any substance supports the PSC’s determination that the plant has sufficient capacity to treat an average of 1.5 million — instead of 1.25 million — gallons of wastewater per day over the course of a year.
The final order under review describes “plant capacity [a]s the ability of the plant to respond to variations in flow and pollutant load, and whichever of these -variables is the most limiting is usually the final determining factor.” Witnesses and the final order alike stated various plant capacities as average daily flows on an annual basis. The testimony was uncontroverted that, although the *628 plant could handle more than 1.5 MGD hydraulically[6] (even before expansion of its treatment capacity to 1.25 MGD), its ability to treat pollutants was the limiting factor and that (after it was enlarged) “[biologically, it can only handle 1.25[MGD]” as an average daily flow on an annual basis.
The PSC also purported to rely on proof that no new tanks would need to be added to create a 1.5 MGD capacity and that it would be unnecessary to replace certain other existing equipment in order to equip the plant to treat larger flows. But the selfsame tanks were part of the plant when the PSC determined that the plant had a capacity of only 1.0 MGD in 1992. Logically what is important is what changes must be accomplished, not what changes could be avoided, in increasing plant capacity from 1.25 MGD to 1.5 MGD. On this question, uncontroverted testimony established that improvements costing several hundreds of' thousands of dollars would be necessary[7] in order to increase treatment capacity from 1.25 to 1.5 MGD.
Here, as in Marco Island Utilities v. Public Service Commission, 566 So.2d 1325, 1328 (Fla. 1st DCA 1990)(reversing unsupported finding of fact expert evidence notwithstanding), “there is really no conflict in the ... experts’ opinions when the basis and reasons therefor are carefully examined.” The only witness with actual knowledge of the capacity of the plant as built testified that the treatment capacity of the plant was, as an average on an annual basis, 1.25 MGD. The final order under review gives no good reason for rejeeting this testimony or for adopting any other finding as to the amount of treatment capacity at Florida Cities’s North Fort Myers Advanced Wastewater Treatment Plant.
“Commission orders come to the Court ‘clothed with the statutory presumption that they have been made within the Commission’s jurisdiction and powers, and that they are reasonable and just and such as ought to have been made.’ ” Florida Cable Television Ass’n v. Deason, 635 So.2d 14, 15 (Fla.1994), citing United Tel. Co. v. Public Serv. Comm’n, 496 So.2d 116, 118 (Fla.1986)(quoting General Tel. Co. v. Carter, 115 So.2d 554, 556 (Fla.1959)). In the present case, however, Florida Cities has successfully borne “the burden of overcoming those presumptions by showing a departure from the essential requirements of law.” Florida Interexchange Carriers Ass’n (“FICA”) v. Clark, 678 So.2d 1267, 1270 (Fla.1996).
Reversed and remanded.
ERVIN and KAHN, JJ., concur.

. The final order did not make entirely clear whether the PSC had found that all of the money the utility expended on expansion and improvements was necessitated by governmental regulations. At oral argument, however, the PSC’s appellate counsel responded to clarifying questions from the bench, as follows:
Q Does the finding that it was in the public interest represent a finding that these changes were made to satisfy regulatory requirements?
A Yes it does.
Q So you concede that these improvements were made in response to regulatory requirements?
A Certainly, but it doesn't mean that everything needs to go in [the current rate base], and the current customers need to pay for the new construction.

. Florida Administrative Code Rule 25-30.4415 addresses the information that a utility needs to include in its application for a rate increase if the utility is claiming the investment was required by government regulations.

. Florida Administrative Code Rule 25-30.434(1) provides:
An Allowance For Funds Prudently Invested (AFPI) charge is a mechanism which allows a utility to earn a fair rate of return on prudently constructed plant held for future use from the future customers to be served by that plant in the form of a charge paid by those customers.

. Neither party has advocated on appeal for a discrete "used and useful’’ calculation for the reuse facility or contended that the reuse facility should be considered separately from the rest of the system. We do not, therefore, reach any question arising under section 367.0817(3), Florida Statutes (1995).

. To the extent, if any,- the discrepancy is attributable to a change in policy, no explanation for such a change has been offered. No policy change has in fact been articulated in this regard. For the reasons discussed in the previous section, no such policy change could be upheld, in any event.

. The final order confuses hydraulic capacity with biological treatment capacity in discussing Public Counsel's Exhibit No. 26. This exhibit shows that flows exceeded 1.25 MGD on twelve days (on nine of which flows also exceeded 1.5 MGD) during the test year, after construction had been ongoing for some three months. Pollutant loading did not vary directly with flows, however. The only engineer asked the significance of these data explained that, in designing a plant with the capacity to treat 1.25 MGD as an average daily flow on an annual basis, design engineers are obliged to provide capacity to treat flows that exceed the daily average, in order to accommodate peak days and months.

. According to Mr. Cummings' unchallenged testimony, the chlorine feed system, diffusers, reclaimed water system, and miscellaneous structural and mechanical fixtures would all need to be enlarged or upgraded to provide treatment capacity of 1.5 MGD. While Mr. Cummings declined to give an exact figure, he did testify that the cost of these improvements would amount to hundreds of thousands of dollars. He also testified — again without contradiction — that additions to the plant, including installation of effluent filters and nitrogen removal systems and equipment to allow pumping between basins, would also need to be made — at a cost of additional hundreds of thousands of dollars — to increase the plant’s treatment capacity to 1.5 MGD. These sums approach or exceed the costs of expansion incurred to date.