KOGAN, Justice.
We have for review an order of the Florida Public Service Commission (Commission) approving an “Agreement for Purchase and Sale of Electric System” entered into by Florida Power Corporation and Sebring Utilities Commission. We have jurisdiction pursuant to article V, section 3(b)(2), Florida Constitution, and section 366.10, Florida Statutes (1991).
Florida Power Corporation (Florida Power) and Sebring Utilities Commission (Sebr-ing) filed a joint petition for approval of several aspects of a purchase and sale agreement under which Florida Power will acquire Sebring’s electric utility system and provide electric service to present and future customers in the Sebring service territory. The Action Group, a customer association, was granted intervenor status. Both a customer hearing and a technical hearing were held. After arguments and the Commission’s staff recommendation were heard, the Commission entered the order under review.
The circumstances leading to the purchase and sale agreement are recited in the Commission’s order as follows:
The Sebring Utilities Commission is in serious financial distress. Faced with escalating debt obligations in 1991, the Sebring Utilities Commission sold its generation facilities and most of its transmission facilities to Tampa Electric Company. At that time Sebring entered into a purchased power contract with Tampa Electric Company to supply all of its capacity needs. The sale to Tampa Electric Company did not solve Sebring’s financial problems, however, and debt service on approximately $85 million of bonds that remain outstanding has drained Sebring’s resources and brought it to the verge of bankruptcy.
Presently, Sebring is in default of its bond covenants. The rates Sebring levies upon its customer base are not sufficient to cover the debt service and maintain required reserve margins. Sebring maintains that compliance with its bond covenants would require an estimated thirty-seven percent increase in current rates, raising a typical residential electric bill to $151 per 1000 kwh [(kilowatt hours)]. Sebring has drawn on its reserves to avoid raising its electric customers’ rates, because those rates are already the highest in the state.
Sebring’s rates compare most unfavorably to those of its nearest neighbor, Florida Power Corporation. Customers of Sebring presently pay $110 per 1000 kilowatt hours (kwh) of electricity, while their neighbors served by Florida Power Corporation pay $71 per 1000 kwh of electricity. Decades of territorial conflict and competition have left the two utilities’ service areas entwined and confused, emphasizing the rate discrepancy between the two utilities. Property val *685 ues in Sebring are depressed, and the community is dissatisfied and divided.
To provide rate relief to its customers and retire its existing bonds, Sebring issued a request for proposals to purchase its electric distribution and remaining transmission facilities. Florida Power Corporation was selected as the successful bidder. Negotiations began soon thereafter, and culminated after more than a year in the contract that is the subject of these proceedings, the “Agreement for Purchase and Sale of Electric System.”
The order explains the relevant terms of the agreement as follows:
The agreement provides for [Florida Power] to purchase the remaining assets of the Sebring electric system for a base purchase price of not more than $54 million, plus an additional amount to cover Sebring’s miscellaneous debts and expenses and any amount owed by Sebring to Tampa Electric Company for power purchases under the power purchase agreement. The base purchase price is the amount the parties have estimated will be necessary to repay in full all of Sebring’s outstanding bonds. The City of Sebring will pay $21.5 million to purchase Sebring’s water system, and that amount and the balance of Sebring’s reserve funds will also be applied to repay the bonds.
The base purchase price includes three components: 1) the net book value of Sebring’s assets as of the closing date_; 2) an amount for “Going Concern” the Commission determines appropriate; and 3) the remainder that represents the amount above net book value and going concern value needed by Sebr-ing to retire its debt.
The agreement provides that Florida Power Corporation will recover the remainder of the base purchase price above net book and going concern value specifically from customers that Sebring was serving as of the date of closing, and all new customers in the Sebring service area over a period of 15 years. That amount, plus costs to finance the purchase, interest expense, and certain fees and taxes, would be charged only to those customers as a separate rate, the “SR-1 Rate Rider,” in addition to Florida Power Corporation’s approved rates. The rate rider would not be charged to Florida Power Corporation’s general body of ratepayers.
The Action Group took the position that the Commission is without subject matter jurisdiction to approve the “Sebring rider.” The Action Group argued that the rider is not a “rate” as contemplated by chapter 366, rather it is a “loan” from Florida Power to Sebring that will be recovered from Sebring’s customers. In answer to this challenge the Commission stated:
It is axiomatic that if we have exclusive and plenary jurisdiction over the rates and charges of public utilities, and we are charged with the obligation to ensure that the rates and charges are fair[,] just and reasonable, we must have jurisdiction to determine what is a rate in the first place....
Action Group’s argument is a rate discrimination argument, not a jurisdictional one. The proper question to ask here is not whether the proposed Sebring Rider is a rate. The proper question to ask is whether the proposed Sebring Rider unduly discriminates between customers who are similarly situated and who receive essentially the same service. Action Group does not question our jurisdiction to answer the question when it is posed this way.
The Commission then determined that the Sebring rider was not unduly discriminatory. In reaching this conclusion the Commission reasoned that
the rider accurately represents the additional cost to serve the Sebring customers because of Sebring’s financial difficulties, and we believe that it would be discriminatory to pass that additional cost to Florida Power Corporation’s general body of ratepayers....
... The record of this proceeding makes it perfectly clear, despite many Sebring customers’ wish that it be otherwise, that the cost of the Sebring debt is *686 a cost to serve the Sebring customers. That cost attaches to that class of customers, and distinguishes it from other classes of customers, no matter who provides the electric service. It will not simply go away.
After reviewing all aspects of the Sebring rider and the SR-1 rate schedule, the Commission approved the rider and the rate schedule as part of Florida Power’s rate schedule.
In its conclusion the Commission went on to explain that
[a]s a general rule, we do not permit utilities to identify a pool of debt costs and apply those costs to a particular set of customers. Nevertheless, unique problems require unique solutions, and under this particular set of extraordinary circumstances, we believe our decision is in the best interest of all concerned.
The only issue presented in this appeal is whether the Public Service Commission has subject matter jurisdiction to approve the proposed Sebring rider. The Commission’s determination that it has such authority will not be overturned unless it is found to be clearly erroneous. Ft. Pierce Util. Auth. v. Fla. Pub. Serv. Comm’n, 388 So.2d 1031 (Fla.1980). Based on our review of the pertinent statutes and case law we conclude that it is not.
The essence of The Action Group’s argument is that the Sebring rider is not a “rate” over which the Commission has jurisdiction because it “is not the consideration for any service rendered to ratepayers.” We agree with the Commission that there is nothing in chapter 366 to justify such a narrow reading of the Commission’s jurisdiction. The Action Group focuses on but one facet of the ratemaking formula— the actual delivery of electric power. It ignores all other statutory factors, including the costs of providing that service to a given class of customers.
Section 366.041(1), Florida Statutes (1991), provides that in fixing the “just, reasonable, and compensatory rates, charges, fares, tolls, or rentals” to be charged for service by utilities under its jurisdiction,
the commission is authorized to give consideration, among other things, to the efficiency, sufficiency, and adequacy of the facilities provided and the services rendered; the cost of ■providing such service and the value of such service to the public; the ability of the utility to improve such service and facilities....
(Emphasis added.) Subsection (2) of section 366.041 provides that the Commission’s authority to set such rates, charges, fares, tolls, or rentals is to be “construed liberally.” [1] Section 366.05(1), Florida Statutes (1991), provides that in the exercise of its jurisdiction the Commission has “power to prescribe fair and reasonable rates and charges, [and] classifications.” Section 366.06(1), Florida Statutes (1991), which directs that a public utility may not impose any charge on its customers without the Commission’s approval, further provides that
[i]n fixing fair, just, and reasonable rates for each customer class, the commission shall, to the extent practicable, consider the cost of providing service to the class, as well as the rate history, value of service, and experience of the public utility....
(Emphasis added.) In apparent harmony with this broad grant of authority, the Commission exercised its jurisdiction by approving imposition of the SR-1 rate rider on customers in the Sebring territory, reasoning that repayment of Sebring’s debt “is a cost to serve the Sebring customers” that “attaches to that class of customers, and distinguishes it from other classes of customers, no matter who provides the electric service.”
However, prior to affirming this exercise of jurisdiction, we must address the effect of chapter 91-343, Laws of Florida, Special *687 Acts of 1991.[2] The Action Group contends that the special act evinces the legislative intent that any “debt repayment surcharge,” such as the rider exacted on Sebr-ing customers, not be considered a “rate or charge” for purposes of the Public Service Commission’s chapter 366 jurisdiction.
Section 1 of the special act authorizes the Sebring Utilities Commission to fix, at least annually, a debt repayment surcharge to enable it to meet all of its covenants with respect to and make all payments required on its bonds. Section 1 also authorizes the purchaser or lessee of all or a substantial portion of Sebring’s electric utility system, as agent for Sebring, to collect the surcharge for electric service customers in the Sebring territory and pay the surcharge to Sebring as and when collected from those customers. Section 1 further provides that the debt repayment surcharge would not be deemed a rate or charge or part of Sebr-ing’s rate structure under chapter 366. Finally, section 4 provides that the special act would take effect only upon its approval by majority vote of electors residing in the affected service territory voting in a referendum to be called by the City of Sebring.
As recognized by The Action Group, the special act never became effective because chapter 91-343 was never submitted to a vote of the electorate. Moreover, we agree with the Commission that even if the legislation had been approved, it has no application in this case. The only legislative intent expressed in connection with a “debt repayment surcharge” is in the context of the collection scheme authorized in the act.
We also agree with the Commission that the Sebring rider clearly falls within the broad definition of “rate” approved by this Court in City of Tallahassee v. Mann, 411 So.2d 162, 163 (Fla.1981):
“Rates” refers to the dollar amount charged for a particular service or an established amount of consumption. Rate structure refers to the classification system used in justifying different rates.
The proposed amount to be charged to customers in the Sebring service area is Florida Power’s regular rate plus the Sebring rider which reflects the cost of the Sebring debt, a cost necessarily associated with the provision of electric service to that class of customers.[3] Moreover, because the Sebr-ing rider clearly results in differential charges to customers within and without the Sebring service area it constitutes a classification system and therefore is a matter of “rate structure” subject to the jurisdiction of the Public Service Commission.[4] Id., at 163-64.
Accordingly, those portions of the order under review approving the Sebring rider and SR-1 rate schedule are affirmed. No motion for rehearing shall be entertained.
It is so ordered.
BARKETT, C.J., and OVERTON, McDonald, SHAW, GRIMES and HARDING, JJ., concur.

. See also section 366.01, Florida Statutes (1991), which provides for the liberal construction of all provisions of the chapter for the *687 accomplishment of the regulation of public utilities and the protection of the public welfare.

.Chapter 91-343, Laws of Florida (1991) amends chapter 23535, Laws of Florida (1945), which as amended by chapter 90-474, Laws of Florida (1990), authorizes and empowers Sebr-ing to sell, convey, transfer, and lease its assets, including the transfer of its customers and service area, with the approval of a majority of the members of the City Council of the City of Sebring.

. The cost of the Sebring debt is a cost associated with the provision of electric service to both City of Sebring residents and noncity ratepayers who reside in the Sebring service area. We do not address the Action Group's peripheral noncity resident discrimination claim because the issue was not raised below and it in no way affects the Commission’s jurisdiction, the only issue properly before us.

. Section 366.04(2)(b), Florida Statutes (1991), grants the Commission power “[t]o prescribe a rate structure for all electric utilities."