714 So.2d 1046 (1998)
SOUTHERN STATES UTILITIES, n/k/a Florida Water Services Corporation, Appellant/Cross-Appellee,
v.
FLORIDA PUBLIC SERVICE COMMISSION; and Burnt Store Lakes Property Owners Association, Inc., Appellees, and
Citizens of the State of Florida; Marco Island Fair Water Rate Defense Committee, Inc.; Citrus County Board of County Commissioners; Sugarmill Woods Civic Association, Inc.; Concerned Citizens of Lehigh Acres; Spring Hill Civic Association, Inc.; East County Water Control District; Hidden Hills Country Club Homeowners Association; Citrus Park Homeowners Association; and Harbour Woods Civic Association, Appellees/Cross-Appellants.
No. 96-4227.
District Court of Appeal of Florida, First District.
June 10, 1998.
Rehearing Denied July 5, 1998.
*1048 Arthur J. England, Jr., and Joe N. Unger of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami; Kenneth A. Hoffman of Rutledge, Ecenia, Underwood, Purnell & Hoffman, P.A., Tallahassee; and Brian P. Armstrong and Matthew J. Feil of Florida Water Services Corporation, Apopka, for Appellant/Cross-Appellee.
Robert D. Vandiver, General Counsel; Mary Anne Helton and Christiana T. Moore of the Florida Public Service Commission, Tallahassee, for Appellee Florida Public Service Commission.
Darol H.M. Carr and David A. Holmes of Farr, Farr, Emerich, Sifrit, Hackett and Carr, P.A., Port Charlotte, for Appellee Burnt Store Lakes Property Owners Association, Inc.
Jack Shreve, Public Counsel; Charles J. Beck and Harold McLean of the Office of Public Counsel, Tallahassee, for Appellee/Cross-Appellant Citizens of the State of Florida.
Frederick C. Kramer of the Law Offices of Frederick C. Kramer, Marco Island, for Appellee/Cross-Appellant Marco Island Fair Water Rate Defense Committee, Inc.
Michael B. Twomey, Tallahassee, for Appellees/Cross-Appellants Citrus County Board of County Commissioners and Sugarmill Woods Civic Association, et al.; Larry M. Haag, County Attorney for Citrus County, Inverness; Arthur Jacobs of Jacobs & Peters, P.A., Fernandina Beach.
B. Kenneth Gatlin and Wayne L. Schiefelbein of Gatlin, Schiefelbein & Cowdery, P.A., Tallahassee, for Amicus Curiae Florida Waterworks Association.

EN BANC
BENTON, Judge.
Revisiting recent cases pertinent to the question, we conclude no statute prohibits resort by the Public Service Commission (PSC)in an appropriate caseto so-called "capbands" to fix rates that are just, reasonable, compensatory, and not unfairly discriminatory. We decide, however, that the rate order under review must be reversed on other grounds. Accordingly, we reverse the order and remand the case to the PSC for further proceedings.
Florida Water Services Corporation (Florida Water) appeals an order in which the PSC set rates in ninety-seven water and forty-four wastewater service areas that Florida Water serves in more than twenty counties. The rate order denied Florida Water's request for uniform, utility-wide rates, but did approve what have been called capband rates. Instead of setting a different rate within each of Florida Water's service areas solely on the basis of the cost of service there, the PSC grouped service areas by cost of service, then set rates uniformly within each group. In this way, the PSC established nine different water rates and seven different wastewater rates, and assigned a rate to each system that Florida Water operates.
Florida Water does not take issue with this aspect of the rate order. The cross-appellants (with the exception of the Office of Public Counsel) contend, however, that the PSC's capband methodology is impermissible under Citrus County v. Southern States Utilities, 656 So.2d 1307 (Fla. 1st DCA 1995), and argue that the PSC's use of the methodology requires reversal. On the other hand, Burnt Store Lakes Property Owners Association, Inc. has participated in support of the capband methodology.
Florida Water urges reversal of the order because (Florida Water alleges) the PSC resorted to a novel method to determine the used and useful percentage of investment in transmission, distribution, and collection systems for mixed use areas (commercial and residential, single family and multiple family); employed a novel used and useful methodology to calculate the used and useful percentage of investment in wastewater treatment plants; did not allow full recovery in rates of costs prudently incurred in constructing reuse facilities; disallowed a previously granted allowance for funds prudently invested (AFPI); denied a requested adjustment to accumulated depreciation to reflect prudent investment in plant not deemed used and useful, thereby precluding recovery of investment made prior to Florida Water's initial AFPI application; approved *1049 refunds for wastewater customers in two service areas where interim rates calculated on a stand alone basis exceeded final rates; and reduced Florida Water's equity in the amount of a refund ordered by the PSC, even though the refund order had been stayed pending appeal and has since been overturned.
Here, as in the proceedings before the PSC, the Office of Public Counsel contends that the rate base for Florida Water's Lehigh Acres water and wastewater utilities should be discounted because a Florida Water affiliate acquired the utilities for less than book value. The Office of Public Counsel also seeks a remand "to the PSC with instructions to calculate refunds of interim rates on a system-by-system basis." Because issues pertaining to refunds may well be moot, once the PSC sets new permanent rates on remand, addressing these issues at this juncture would be premature.
In the Citrus County case, we first grappled with how to treat multiple water and sewer systems in single ownership when setting water and sewer rates for various systems in a single proceeding. We said:
The Water and Wastewater System Regulatory Law, codified at chapter 367, Florida Statutes, grants the PSC authority to set rates for those utilities within its jurisdiction. We conclude that chapter 367 does not give the PSC authority to set uniform statewide rates that cover a number of utility systems related only in their fiscal functions by reason of common ownership. Florida law instead allows uniform rates only for a utility system that is composed of facilities and land functionally related in the providing of water and wastewater utility service to the public. Section 367.171(7), Florida Statutes (1991), grants the PSC exclusive jurisdiction, with some exceptions, over "all utility systems whose service transverses county boundaries." The term "system" is defined as "facilities and land used or useful in providing service and, upon a finding by the commission, may include a combination of functionally related facilities and land." § 367.021(11), Fla. Stat. (1991) (emphasis added).
Citrus County, 656 So.2d at 1309-1310. Examining the question anew, we find no statutory basis for our earlier conclusion that uniform ratesparticularly within groups of systems that have comparable costs of providing servicemust depend on a finding that "facilities and land ... used to provide... water and wastewater services are functionally related." Id. at 1311.

Jurisdictional Question Distinct
The cross-appellants rely on Citrus County for the proposition that capbands cannot be used in setting rates for systems that are not "functionally related." Because there is no issue as to the PSC's jurisdiction over the systems involved in the present case, we conclude the question of "functional relatedness" does not arise. Under chapter 367, "functional relatedness" is purely a jurisdictional concept.
We initially construed the phrase "functionally related" in Board of County Commissioners v. Beard, 601 So.2d 590 (Fla. 1st DCA 1992). The issue there was whether the St. Johns County Water and Sewer Authority could exercise jurisdiction over the Jacksonville Suburban Utilities Corporation (JSUC), which did business in Duval, Nassau, and St. Johns counties. The statute provided:
Notwithstanding anything in this section to the contrary, the commission shall have exclusive jurisdiction over all utility systems whose service transverses [sic] county boundaries, whether the counties involved are jurisdictional or nonjurisdictional, except for utility systems that are subject to, and remain subject to, interlocal utility agreements in effect as of January 1, 1991, that create a single governmental authority to regulate the utility systems whose service transverses county boundaries, provided that no such inter-local agreement shall divest commission jurisdiction over such systems, any portion of which provides service within a county that is subject to commission jurisdiction under § 367.171.
§ 367.171(7), Fla. Stat. (Supp.1990). We affirmed the PSC's determination that it had exclusive jurisdiction over JSUC on the basis *1050 of the "functional interrelatedness of its Duval and St. Johns facilities ... administratively and operationally," and eschewed "a requirement of physical connection." Beard, 601 So.2d at 593. Similar jurisdictional disputes gave rise to the later decision in Hernando County v. Florida Public Service Commission, 685 So.2d 48, 52 (Fla. 1st DCA 1996) (stating that the PSC's jurisdiction hinges on whether "facilities forming the asserted `system' exist in contiguous counties across which the service travels").
Without pausing to examine the joint effect these two decisions may have on a jurisdictional question we have no need to decide here,[1] it is enough for present purposes to reiterate that both Beard and Hernando County concern only whether the PSC has authority to exercise jurisdiction to the exclusion of local government. Neither decision purports to limit in any way the manner in which the PSC sets rates in cases like the present one in which the PSC's ratemaking authority is conceded.
The statute governing ratemaking makes no mention of functional relationships. The only time the phrase "functionally related" appears in chapter 367, Florida Statutes (1997), is in the statutory definition[2] of "system":
"System" means facilities and land used or useful in providing service and, upon a finding by the commission, may include a combination of functionally related facilities and land.
§ 367.021(11), Fla. Stat. (1997). The definition of "system" becomes important only in defining which utility[3] systems are subject to the PSC's jurisdiction and which are subject to the jurisdiction of local government.

Citrus County Decision Overruled
Statutory parameters governing the PSC's ratemaking were at issue in Citrus County and in Sugarmill Woods Civic Association v. Southern States Utilities, 687 So.2d 1346 (Fla. 1st DCA 1997). The present case resembles Citrus County in that the PSC's jurisdiction is not at issue. In Sugarmill, however, Southern States Utilities originally sought a declaratory statement as to the PSC's jurisdiction over systems in Polk and Hillsborough Counties.[4]
Specifically at issue in Citrus County was whether the PSC could establish uniform rates for customers of all the utility systems Southern States Utilities owned. In Citrus County, we held:
Until the Commission finds that the facilities and land owned by SSU and used to provide its customers with water and wastewater services are functionally related as required by the statute, uniform rates may not be approved.
*1051 656 So.2d at 1311. But the PSC's jurisdiction was not at issue in Citrus County. The opinion cites no statute which requires that systems be functionally related in order for the PSC to set uniform rates.
The opinion in Citrus County made an unjustified addition of a factorgermane only to the PSC's jurisdictionto the list of statutory ratemaking criteria. Language from Beard (later echoed in Hernando County) found its way into our ratemaking jurisprudence without statutory warrant. We now hold that, whenever the PSC has jurisdiction to set water and sewer rates for multiple systems, inter-system functional relatedness is no prerequisite to the PSC's setting rates that are uniform across a group of systems. To the extent any prior opinions of this court can be read otherwise, we recede pro tanto from those decisions.
The Legislature has given the PSC very broad authority in determining rates. See, e.g., Citizens of State v. Public Serv. Comm'n, 425 So.2d 534, 540 (Fla.1982) (holding analogous statutory provisions pertaining to electric and telephone utilities grant broad authority).
The statutory standard imposed upon the Commission is to fix "fair, just and reasonable rates." §§ 366.06(2), 366.05(1), Florida Statutes (1979). This Court has consistently recognized the broad legislative grant of authority which these statutes confer and the considerable license the Commission enjoys as a result of this delegation.
Id. Section 367.081(2), Florida Statutes (1997), contains no requirement that a utility owning multiple systems must prove that the systems are functionally related in order for the PSC to set uniform rates applicable to some or all of the systems.

Authority To Fix Rates
Inasmuch as the PSC, like other administrative agencies, is a creature of statute, "the Commission's powers, duties and authority are those and only those that are conferred expressly or impliedly by statute of the State." Rolling Oaks Utils. v. Florida Public Serv. Comm'n, 533 So.2d 770, 773 (Fla. 1st DCA 1988). See, e.g., Deltona Corp. v. Mayo, 342 So.2d 510 n. 4 (Fla.1977) (quoting City of Cape Coral v. GAC Utils., 281 So.2d 493, 496 (Fla.1973)). The statute that grants ratemaking authority to the PSC in water and sewer cases is drawn broadly to provide:
(2)(a) The commission shall, either upon request or upon its own motion, fix rates which are just, reasonable, compensatory, and not unfairly discriminatory. In every such proceeding, the commission shall consider the value and quality of the service and the cost of providing the service, which shall include, but not be limited to, debt interest; the requirements of the utility for working capital; maintenance, depreciation, tax, and operating expenses incurred in the operation of all property used and useful in the public service; and a fair return on the investment of the utility in property used and useful in the public service. However, the commission shall not allow the inclusion of contributions-in-aid-of-construction in the rate base of any utility during a rate proceeding; and accumulated depreciation on such contributions-in-aid-of-construction shall not be used to reduce the rate base, nor shall depreciation on such contributed assets be considered a cost of providing utility service. The commission shall also consider the investment of the utility in land acquired or facilities constructed or to be constructed in the public interest within a reasonable time in the future, not to exceed, unless extended by the commission, 24 months from the end of the historical test period used to set final rates.
§ 367.081, Fla. Stat. (1997). Florida statutory criteria for ratemaking include "the value and quality of the service" as well as "the cost of providing the service," but the statute makes no explicit reference to a utility company's owning more than one utility system and is silent as to what bearing, if any, ownership of multiple systems should have in setting rates.
In Connecticut, despite a lack of statutory authority to consider the value of service along with the cost of service, the Supreme Court of Connecticut ruled:

*1052 The plaintiffs claim, however, that rate equalization is arbitrary, unreasonable and contravenes the statute because it is inherently discriminatory and because the statute requires that rates be set only with regard to the cost of service and the need to attract capital. We disagree.
The plaintiffs argue that equalization is arbitrary and discriminatory because it unfairly imposes a disproportionate rate increase on a given district without regard to the cost of service to that district. A decision to establish any rate in a multi-service environment inevitably results in the same rate for different ratepayers whose actual costs of service may differ. For example, in a single community there will inevitably be differences in the cost of service to ratepayers on different streets or in different residences. Furthermore, the statute nowhere requires that the DPUC base its cost analysis at the city or district level. The DPUC relying upon its expertise and after a thorough review of the evidence, has decided to equalize rates between districts. We conclude that there is nothing in the statute to compel the conclusion that equalizing rates at this level is unreasonably discriminatory as a matter of law and we are therefore unwilling to disturb the decision of the DPUC.
Town of Greenwich v. Department of Public Util. Control, 219 Conn. 121, 592 A.2d 372, 374-75 (1991)(footnote omitted). We reach the same conclusion here on what is perhaps a firmer statutory foundation.
In doing so, we adopt the PSC's own interpretation of statutes it administers. See Morris v. Division of Retirement, 696 So.2d 380 (Fla. 1st DCA 1997). The PSC has set uniform rates in other cases involving multiple systems. See In re Application of Jacksonville Suburban Utils. Corp., 93 F.P.S.C. 10:133, 137 (1993) ("[U]niformity may result in cost savings due to a reduction in accounting, data processing and administrative expenses."); In re Application of Lake Util. Serv., 93 F.P.S.C. 7:656 (1993); In re Application of Heartland Utils., 90 F.P.S.C. 10:316 (1990); In re Application of Holiday Util. Co., 85 F.P.S.C. 6:203 (1985); In re Application of Florida Cities Water Co., 84 F.P.S.C. 1:118 (1984); In re Application of Gulf Util. Co., 83 F.P.S.C. 1:134 (1983). Until the decision in Citrus County, the PSC's statutory authority to proceed in this fashion had never been called into serious question.

Capband Rates
In the proceedings below, the PSC determinedafter Citrus County had been decidedthat all of the systems owned by Florida Water were functionally related, and concluded on that basis that the Commission had authority to set uniform, utility-wide rates.[5] Instead of doing so, however, the PSC, perhaps looking over its shoulder at the Citrus County decision, took the intermediate step of setting rates that are uniform only within each of several groups of systems.
In support of their contention that "capband rates" are unfairly discriminatory, the cross-appellants (with the exception of the Office of Public Counsel) cite Action Group v. Deason, 615 So.2d 683, 686 (Fla. 1993) ("The only issue presented in this appeal is whether the Public Service Commission has subject matter jurisdiction to approve the proposed Sebring rider."), and Wabash Valley Electric Co. v. Young, 287 U.S. 488, 53 S.Ct. 234, 77 L.Ed. 447 (1933) (holding that state law may require separate ratemaking for each municipality). Neither of these cases stands for the proposition that uniformor capbandrates in multiple systems run afoul of any provision of Florida law or in any way offend the federal constitution.
Nothing inherent in the capband methodology runs afoul of the statute. The order under review sets rates[6] so that no ratepayer's *1053 rates for wastewater exceed by more than seven per cent what they would have been if each system's rates had been set on a stand alone, cost of service basis. This modest deviation from a pure cost of service basis for individual rates pales by comparison to the magnitude of inevitable intra-system subsidization. Nor is a pure cost of service basis as to each individual ratepayer mandated by a statute which directs that "the commission shall consider the value and quality of service and the cost of providing service." § 367.081(2), Fla. Stat. (1997). See Occidental Chem. Co. v. Mayo, 351 So.2d 336, 340 (Fla.1977) ("Given the multiplicity of methods suggested by the experts to allocate expenses between various users, we cannot say that the Commission departed from the essential requirements of law in relying on a range of criteria for this purpose."). A shift in the direction of "affordability" takes the value of service into account. Although using stepped rates or "capbands" requires offsetting increases and does not spread offsets perfectly evenly among households paying less than maximum rates, such use need not lead to unfairly discriminatory rates.

Cost Of Service Remains Starting Point
The PSC properly requires rigorous cost accounting in every ratemaking case. By providing that rates be reasonable, section 367.081(2)(a), Florida Statutes (1997), so dictates. In the aggregate, rates and charges must assure the utility a fair return on its investment, but no more: The PSC is charged with the responsibility of seeing that utilities do not abuse the monopoly power they enjoy.
The PSC must determine the extent of the utility's investment reasonably dedicated to providing the public service and examine carefully expenses the utility incurs in the process. The order under review aptly observes:
Utilities should be prudent and efficient in their business operations.... The most efficient way to ensure accountability is to force a utility to look at these decisions as they relate to the cost and benefits of the particular service area rather than on a total company basis where the individual investment decisions often appear immaterial.
As the PSC itself recognizes, the use of capbands or uniform rates in no way diminishes the force of the statutory requirement that rates be reasonable. Before setting rates for separate classes of customers, the utility must establish and the PSC must approve a determination of the utility's overall revenue requirements.
Revenue requirements depend on the cost of the service the utility provides, operating expenses as well as the cost of capital. We turn now to the cost accounting issues the parties have raised in this case, bearing in mind that PSC orders come to us "clothed with a presumption of validity." City of Tallahassee v. Mann, 411 So.2d 162, 164 (Fla. 1981) (On Petition for Rehearing).

Lehigh Acres Acquisition
Florida Water acquired the water and sewer utility serving Lehigh Acres for less than what it cost the original owner to build the used and useful infrastructure. In the order under review, the PSC declined a request *1054 from the Office of Public Counsel to make a downward adjustment in the rate base to reflect the price Florida Water paid, ruling:
This Commission has acknowledged that absent extraordinary circumstances, the purchase of a utility system at a premium or discount should not affect rate base. This has created an incentive for larger utilities to acquire small, troubled utilities. In fact, many small utilities[] have been acquired by larger utilities, and we have changed rate base in only a few instances.
... We acknowledged that we had consistently interpreted the "investment of the utility," as contained in Section 367.081(2)(a), Florida Statutes, to be the original cost of the property when first dedicated to the public service, and would not deviate from that interpretation.
The Office of Public Counsel made no showing of exceptional or extraordinary circumstances. It argued that, since neither Lehigh Acres system was small or troubled, no basis existed for the PSC to deny an adjustment to rate base to reflect the discounted purchase price. We note that the Resolution Trust Corporation is in Florida Water's chain of title and that the Office of Public Counsel had previously argued unsuccessfully for a reduction in this utility's rate base. See In re Application of Lehigh Utils., 93 F.P.S.C. 7:319 (1993). We conclude that the PSC lawfully exercised its discretion in declining to make the requested adjustment in the present proceeding.

Used And Useful: Wastewater Treatment Plant
Florida Water contends that the PSC departed from prior policy without adequate explanation or record support when it used a new methodology for calculating which portions of eight of its wastewater treatment plants were used and useful.[7] When the order under review was entered, the PSC did not have the benefit of our decision in Florida Cities Water Company v. State, Public Service Commission, 705 So.2d 620 (Fla. 1st DCA 1998), in which we reversed a rate order and remanded with directions that the PSC give a reasonable explanation, supported by record evidence, for the methodological change. Id. at 626. On the authority of Florida Cities, we also reverse and remand in the present case.
In finding insufficient record support in Florida Cities to justify a change in the method the PSC employed to calculate the used and useful percentage of investment in the wastewater treatment facility at issue in that case, we explained the method and the policy it replaced:
The PSC also changed the method it used to calculate a used and useful percentage. In the 1992 rate case, the PSC made the average daily flow calculated on a peak month basis the numerator of a fraction whose denominator was the plant's treatment capacity (stated in terms of average daily flow over a year's time). Since the fraction was greater than one, the PSC did not reach the question of a margin reserve. In the present case, the PSC changed the way it arrived at the numerator: Instead of using the average daily flow calculated on a peak month basis, it used the average daily flow calculated on an annual basis (to which it added a "reserve" of 4.58 percent), so reducing the used and useful percentage (addition of the reserve notwithstanding).
Id. at 622. The PSC has employed the same method to calculate used and useful percentages for wastewater plants in dispute in the present case, once again, we decide, without an adequate record basis for the change from past practice.
The explanation the PSC offered for the change in Florida Cities was that the PSC was correcting a mathematical error it had made in prior cases. We found a deliberate change in policy, and rejected the PSC's explanation as inadequate and lacking record support:
*1055 Disregarding the peak month average and substituting the lower annual average daily flow figures reflected a considered break with agency policy. In making the change, the PSC acted inconsistently with its published regulatory philosophy. See In re Petition of Sailfish Point Util. Corp., 91 F.P.S.C. 9:332, 345 (1991)(cited for its used and useful proposition in PSC Digest of Commission Regulatory Philosophies as Expressed in Ratemaking Proceedings and Current Decisions, Division of Water and Wastewater, Rev. 2/95, p. III-45, under the heading "III Rate Base, H. Plant Held for Future Use, Used and Useful, Current Policy"). No newly promulgated rule necessitated, authorized, or justified such a policy change.
The use of average daily flow in the maximum month to calculate how much treatment capacity is "used and useful" in a wastewater rate case had been repeatedly articulated as the PSC's policy. See In re Application of Indian River Utils., Inc., 96 F.P.S.C. 2:695 (1996); In re Application of Poinciana Utils., Inc., 94 F.P.S.C. 9:349, 353 (1994)(average daily flow during maximum month used to determine wastewater plant used and useful); In re Application of Gen. Dev. Utils., Inc., 93 F.P.S.C. 7:725, 742-744 (1993)(average day demand of the maximum month used to calculate used and useful); In re Application Florida Cities Water Co. (Golden Gate Division), 92 F.P.S.C. 8:270, 291 (1992)(wastewater plant 100% used and useful since it was operating above rated design capacity during maximum flow periods); In re Application of Florida Cities Water Co. (South Ft. Myers Sys.), 92 F.P.S.C. 4:547, 551-552 (1992).
Under section 120.68, Florida Statutes (Supp.1996), remand is required in these circumstances. The statute provides:
(7) The court shall remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action, as appropriate, when it finds that:
....
(e) The agency's exercise of discretion was:
....
3. Inconsistent with officially stated agency policy or a prior agency practice, if deviation therefrom is not explained by the agency....
§ 120.68, Fla. Stat. (Supp.1996). We have held that "agency action which yields inconsistent results based upon similar facts, without reasonable explanation, is improper." Martin Mem. Hosp. Ass'n v. Dep't of Health and Rehabilitative Servs., 584 So.2d 39, 40 (Fla. 4th DCA 1991)(citing North Miami Gen. Hosp., Inc. v. Office of Community Med. Facilities, Dep't of Health and Rehabilitative Servs., 355 So.2d 1272, 1278 (Fla. 1st DCA 1978)).
The last time a "used and useful" percentage was calculated for Florida Cities's North Fort Myers Advanced Wastewater Treatment Plant, the peak month average daily flow figure was employed. The final order under review acknowledged the change that took place in the present proceeding:
In Docket No. 910756-SU, using the projected test year ended June 30, 1993, the Commission observed that FCWC's investment would be substantially enlarged when it completed construction of a 1.0 mgd advanced wastewater treatment plant. In that proceeding, the Commission found that FCWC's investment was 100 percent used and useful based upon a comparison of average daily flow conditions during a peak month to available capacity. In this proceeding, we are disregarding the peak month measurements and are using annual average daily flow considerations.
Because this policy shift was essentially unsupported "by expert testimony, documentary opinion, or other evidence appropriate to the nature of the issue involved," Manasota-88, Inc. v. Gardinier, Inc., 481 So.2d 948, 950 (Fla. 1st DCA 1986), the PSC must, on remand, give a reasonable explanation, if it can, supported by record evidence (which all parties must have an opportunity to address) as to why average daily flow in the peak month was ignored.
*1056 705 So.2d at 625-26. Although abandoning its claim of mathematical error, the PSC again argues that it should put aside its past practice in favor of employing average annual daily flows both as the numerator and as the denominator of the used and useful fraction. Its stated rationale is that the Department of Environmental Protection has begun to specify that the volumes indicated on operating permits it issues are average annual daily flows. Under the Department's prior practice, wastewater treatment plant operating permits were apparently issued without written advice as to precisely how the volume of wastewater specified as a limit was to be understood.
Proof that the Department of Environmental Protection is now using different language on the operating permits is not enough to support a departure from prior PSC policy. As counsel for the PSC admitted at oral argument, a change in language on the face of the permit does not necessarily bear any relationship to a change in the actual capacity of any treatment plant. The use of the PSC's new method to calculate used and useful percentages is a shift in PSC policy, which no change in the wording of a permit justifies, unless the change in wording corresponds to a real change in operating capacity.
We reverse the order under review because the PSC relied on a new method to determine the used and useful percentage of wastewater treatment plants, without adequate evidentiary support. Here, as in Florida Cities,
[b]ecause this policy shift was essentially unsupported "by expert testimony, documentary opinion, or other evidence appropriate to the nature of the issue involved," Manasota-88, Inc. v. Gardinier, Inc., 481 So.2d 948, 950 (Fla. 1st DCA 1986), the PSC must, on remand, give a reasonable explanation, if it can, supported by record evidence (which all parties must have an opportunity to address) as to why average daily flow in the peak month was ignored.
Id. at 626. While we do not rule out the possibility that evidence can be adduced on remand to show that calculating a used and useful fraction by comparing average annual daily flows to plant capacity as stated on operating permits is preferable to the PSC's prior practice, we nevertheless conclude that remand for the taking of such evidence (if it exists) is necessary.

Used And Useful: Transmission, Distribution, And Collection Systems
The present proceeding marked another departure from longstanding agency practice, as the PSC admitted in its answer brief:
In the instant case, for the first time the Commission applied the lots to lots or lot count methodology to determine the used and useful percentages for Florida Water's water transmission and distribution and wastewater collection lines for each of its service areas.
Previously, the PSC had arrived at used and useful percentages for distribution and transmission systems by taking the number of "equivalent residential connections"instead of occupied lotsas the numerator in the used and useful fraction.
For systems serving areas containing only single-family houses, use of either the lot count method (comparing lots connected to lots where connections are available) or of the ERC to lot count method (comparing equivalent residential connections to lots where connections are available) yields the same result. But for systems serving mixed use developmenta combination of residential (single and multiple family) and commercial users, for examplethe two methods produce different results. Equivalent residential connections (ERCs) are calculated by counting the number of water meters connected and adjusting for the size of any meter larger than the standard meter for a single family dwelling. The lot count method will never result in a used and useful percentage higher than the ERC to lot count method.
In earlier cases, the PSC expressly rejected arguments that the lot count method was appropriate for determining used and useful percentages of investment in distribution and collection systems serving mixed use areas.

*1057 In determining the used and useful percentage for the water distribution and sewage collection systems, we do not believe that it is appropriate to take the total number of lots with service connections and divide by the total number of lots available to calculate the used and useful percentage. When there is mix of large condominiums and single family residences, there must be a complete evaluation of the water distribution and sewage collection systems to include the location of the existing customers and the extent of the systems .... the staff engineer concluded after an evaluation of the system that the water distribution and sewage collection systems were 100% used and useful. We agree and find that the water distribution systems and sewage collection systems are 100% used and useful.
In re Application of Marco Island Utils., 87 F.P.S.C. 5:224, 230 (1987). Evidence of record in the present case does not support or explain the PSC's switch to the lot count method for evaluating systems serving mixed use areas.[8]
The PSC's conceded change of method in calculating used and useful percentages for distribution and collection systems is another "policy shift ... essentially unsupported `by expert testimony, documentary opinion, or other evidence appropriate to the nature of the issue involved,' Manasota-88, Inc. v. Gardinier, Inc., 481 So.2d 948, 950 (Fla. 1st DCA 1986)." Florida Cities, 705 So.2d at 626. For this policy shift, too, the PSC must give a reasonable explanation on remand and adduce supporting evidence, if it can, to justify a change in policy required by no rule or statute. That failing, the PSC should adhere to its prior practices in calculating used and useful percentages for water transmission and distribution systems and wastewater collection systems serving mixed use areas.[9]

Used And Useful: Reuse Facilities
For the most part, the Legislature has committed used and useful calculations to the expertise and discretion of the PSC. Nothing we have said above should be understood otherwise. It is not for a reviewing court to dictate methodology or other policy within the PSC's "statutorily delimited sphere." Florida Dep't of Ins. v. Bankers Ins. Co., 694 So.2d 70, 71 (Fla. 1st DCA 1997). As regards used and useful calculations, our concern thus far has been only that the PSC comply with the procedural requirements of the Administrative Procedure Act, chapter 120, Florida Statutes (1997), in making changes in policies governing these calculations. The PSC is, after all, subject to the Act.
The Legislature has, however, occasionally specified a particular accounting treatment by statute which the PSC is not at liberty to ignore in making used and useful or other ratemaking calculations. The treatment of contributions-in-aid-of-construction is one example. Moneys received as contributions-in-aid-of-construction cannot be included "in the rate base of any utility during a rate proceeding." § 367.081(2)(a), Fla. Stat. (1997). See Florida Waterworks Ass'n v. Florida Public Serv. Comm'n, 473 So.2d 237, 243 (Fla. 1st DCA 1985).
*1058 Here Florida Water complains that the PSC failed to give effect to section 367.0817(3), Florida Statutes (1997), when it treated reuse facilities essentially the same way it treated all other plant and equipment for purposes of making used and useful calculations. Florida Water advocates "a discrete `used and useful' calculation for the reuse facility ... [and] contend[s] that the reuse facility should be considered separately from the rest of the system." Florida Cities, 705 So.2d at 624 n. 4. Florida Water contends that reuse facilities are one hundred percent used and useful by statute.
We agree that, in order to comply with the statutory mandate requiring that the entire cost of a prudently constructed reuse facility be recovered in rates, such a reuse facility must be treated as if it were one hundred percent used and useful. Section 403.064(10), Florida Statutes (1995), provides:
Pursuant to chapter 367, the Florida Public Service Commission shall allow entities under its jurisdiction which conduct studies or implement reuse projects, including, but not limited to, any study required by subsection (2) or facilities used for reliability purposes for a reclaimed water reuse system, to recover the full, prudently incurred cost of such studies and facilities through their rate structure.
Enacted at the same time as this provision, section 367.0817(3), Florida Statutes (1995), provides:
All prudent costs of a reuse project shall be recovered in rates. The Legislature finds that reuse benefits water, wastewater, and reuse customers. The commission shall allow a utility to recover the costs of a reuse project from the utility's water, wastewater, or reuse customers or any combination thereof as deemed appropriate by the commission.
The statute makes no mention of any used and useful analysis for reuse facilities, once a determination is made that a reuse facility is prudent.
This reading of the statutory language is supported by the House of Representatives Committee on Natural Resources, CS/HB 1305, Final Bill Analysis and Economic Impact Statement (1994):
Investor-owned facilities regulated by the Public Service Commission will be able to recover certain costs, such as those expended for the feasibility study, as "prudent and reasonable costs." Previously, recovery of these costs (which do not necessarily benefit present customers of the utility, ie. [sic] "used and useful in the public service") might have arguably been denied by the commission.
Id. at 7. The same source describes the situation prior to the passage of the bill that enacted section 367.0817(3), Florida Statutes (1995), as follows:
Present PSC policy with regard to reuse implementation cost recovery is to allow the utility to "recover the full cost of such facilities through their rate structure." (s.403.064(6), F.S.) However, the PSC generally regards full cost recovery as recovery of that portion of a utility's investment which is found to be "used and useful in the public service," which does not allow for a utility to build facilities with reserve capacity for customers beyond their existing customer base. This acts as a disincentive for investors who might otherwise plan for future growth.
House of Rep. Comm. on Natural Resources, CS/HB 1305, Final Bill Analysis and Economic Impact Statement 2 (1994) (on file with Florida State Archives). In the present case there has been no suggestion that any cost incurred in constructing the reuse facilities was imprudent. We therefore reverse the order under review to the extent it excludes a portion of the construction costs for reuse facilities from rate base.[10]

Other Matters
Florida Water sought authority under Rule 25-30.434, Florida Administrative Code Rule (Allowance for Funds Prudently Invested), to make charges to recover investment in property that was determined not to be *1059 currently used and useful in the present case, and the PSC granted this authority. At the same time, however, the order under review cancelled previously authorized AFPI charges. The PSC has confessed error in cancelling the previously allowed AFPI charges, and stands ready to reinstate the charges on remand.
In seeking authority for new AFPI charges, Florida Water sought to recover investment in, among other things, plant and equipment that was held not to be used and useful in earlier rate cases. Even though Florida Water did not request AFPI charges in the earlier rate cases, it has depreciated all of its depreciable assets, those that were earlier included in the rate base and those that were not. In the present proceeding, the PSC disallowed Florida Water's attempt to restate the value of assets deemed not used and useful by adding back accumulated depreciation. The PSC's approach means that Florida Water will not recover a portion of its investment and will not recover as much as it would have if it had filed a request in the earlier proceedings that property not included in rate base be considered under the AFPI rule. We find no basis, however, for disturbing the PSC's exercise of discretion in this regard.
Florida Water complains that the PSC understated its equity by adjusting it downward in the amount of a refund to customers the PSC had ordered. The refund order was stayed pending appeal when the PSC relied on the order to reduce equity, and the order has since been overturned on appeal. Southern States Utils. v. Public Serv. Comm'n, 704 So.2d 555 (Fla. 1st DCA 1997). The PSC should revisit this matter on remand in light of the status of ongoing litigation on this issue. See Order No. PSC-98-0143-FOF-WS (issued January 26, 1998). We find it unnecessary to address any of the constitutional questions Florida Water raises.
Reversed and remanded.
ERVIN, BOOTH, VAN NORTWICK and PADOVANO, JJ., concur.
NOTES
[1] No party calls the PSC's jurisdiction into question in the present case, nor is there any doubt about the PSC's jurisdiction. We are not unaware that some tension may be said to exist between our decisions in Beard and Hernando County.
[2] The text of this definition has not changed since it was first enacted in 1971.
[3] "Utility" is defined in section 367.21(12), Florida Statutes (1997).

"Utility" means a water or wastewater utility and, except as provided in s. 367.022, includes every person, lessee, trustee, or receiver owning, operating, managing, or controlling a system, or proposing construction of a system, who is providing, or proposes to provide, water or wastewater service to the public for compensation.
[4] The decision in Sugarmill Woods Civic Association v. Southern States Utilities, 687 So.2d 1346 (Fla. 1st DCA 1997), dealt both with whether the PSC had jurisdiction over certain facilities located in non-jurisdictional counties and with the setting of uniform rates for all of the systems over which the PSC had jurisdiction. The PSC's order made no findings on functional relatedness, but set uniform rates. As stated in Sugarmill and elaborated on in Hernando County v. Florida Public Service Commission, 685 So.2d 48 (Fla. 1st DCA 1996), the PSC must determine whether service crosses county lines, and whether systems located in non-jurisdictional counties are functionally related to systems in contiguous counties, in determining its jurisdiction over these systems. The Sugarmill court appropriately looked to section 367.171(7) for this purpose. Today's decision overruling Citrus County v. Southern States Utilities, 656 So.2d 1307 (Fla. 1st DCA 1995), modifies the Sugarmill decision to the extent that it follows Citrus County's requirement of functional relatedness as a prerequisite to setting uniform rates for systems over which the PSC has jurisdiction.
[5] Because we decide that the determination of functional relatedness is not controlling on the issue of whether uniform rates can be set, we express no opinion on whether the utility systems involved in this rate case were "functionally related."
[6] In an earlier docket involving the same systems, No. 920199-WS, the PSC had developed a "modified stand alone" approach, which it used as a starting point in the present case. In Docket No. 920199-WS, the PSC calculated rates on a cost of service basis for each of Florida Water's systems considered individually, thenon the basis of "affordability"set two maximum monthly rates or "caps": $52 for 10,000 gallons of water and $65 for 6,000 gallons of wastewater. In the final rate order in Docket No. 920199-WS, rates that would have exceeded the maximum rates on a stand alone basis were reduced to the maximums.

In order to offset the resulting decrease in anticipated revenue, the PSC approved rates reflecting an increase in revenues as to systems whose calculated "stand alone" rates fell far enough below the maximum rates. The result was a rate increase of $1.38 per month per 10,000 gallons of water, and of $1.45 per month per 6,000 gallons of wastewater for all ratepayers served by systems whose rateson a stand alone, cost of service basiswould have been less than the caps.
In the present docket, the PSC let the same caps dictate the same maximum rates, but adopted a different method for spreading the burden of the shortfall among the remaining ratepayers. The PSC grouped the "non-capped" systemsthose whose rates, if calculated solely on a stand alone, cost of service basis, would fall below the capsinto several "bands," eight for the water systems and six for the wastewater systems. The PSC then set a single rate for all the systems within a given band.
[7] The PSC has confessed error as to its calculations of used and useful percentages for three of the eight systems in dispute. For reasons developed below, we do not assign the same importance the PSC did to the wording on operating permits issued by the Department of Environmental Protection.
[8] The PSC cited the testimony of Ted L. Biddy. But Mr. Biddy's testimony on this point was given in response to the question whether "it is appropriate to use hydraulic analysis in calculating the used and useful percentages of water transmission and distribution systems." Testimony that the lot count method compares favorably with the hydraulic analysis methodtestimony that did not address the relative merits of the lot count method vis-a-vis the ERCs to lots method and that made no mention of using the lot count method for systems serving mixed use areasaffords no support for abandoning prior practice in favor of a change to the lot count method for systems serving mixed use development.
[9] The PSC has in prior cases determined that a distribution system was 100% used and useful if the pipes were of the minimum size necessary to supply the existing customers.

The distribution system pipes are of the minimum size necessary to supply the existing customers and therefore, we find the distribution system 100% used and useful.
In re Application by Heights Water Co., 92 F.P.S.C. 6:393, 395 (1992). As Florida Water argues, where the PSC has previously made this determination about service areas involved in the present case, any deviation from prior policy must be explained.
[10] Before a reuse facility is built, the plans can be submitted to the PSC for approval. § 367.0817(1), Fla. Stat. (1995). In considering whether expenditures for a reuse facility are prudent, the size of the facility figures in.