481 So.2d 948 (1986)
MANASOTA-88, INC., et al., Appellants,
v.
GARDINIER, INC., the Florida Phosphate Council, Inc., and State of Florida, Department of Environmental Regulation, Appellees.
MANASOTA-88, INC., Appellant,
v.
GARDINIER, INC., and State of Florida, Department of Environmental Regulation, Appellees.
Dan LYONS and Manasota-88, Inc., Appellants,
v.
STATE of Florida, DEPARTMENT OF ENVIRONMENTAL REGULATION, Appellee.
Nos. BD-124, BD-296 and BE-22.
District Court of Appeal of Florida, First District.
January 7, 1986.
*949 Thomas W. Reese, St. Petersburg, for appellants.
Robert L. Rhodes, Jr., Lawrence E. Sellers, Jr. and Lynn H. Townsend of Holland & Knight, Lakeland, for Gardinier, Inc. and Florida Phosphate Council.
Charles G. Stephens and Clare E. Gray, Tallahassee, for Dept. of Environmental Regulation.
MILLS, Judge.
Manasota-88, Inc. (M-88) appeals final administrative orders of the Department of Environmental Regulation (DER) denying its petitions for a hearing pursuant to Section 120.57, Florida Statutes (1983), and for a declaratory statement pursuant to Section 120.565, Florida Statutes (1983). Dan Lyons joins M-88 in an appeal of a final order denying a second petition for declaratory statement. We affirm in part and reverse in part.
Gardinier, Inc. (Gardinier) filed with DER in 1981 an application for an industrial waste permit to construct a phosphogypsum disposal field, specifically seeking a Chapter 17-3 ground water permit and determination of compliance with surface water standards. During the pendency of this application, in response to a request from DER, Gardinier submitted a written report on estimated airborne radioactive emissions from the waste pile which would be created. DER requested and received review of the report from HRS. M-88, a non-profit environmental organization, submitted further data of the emissions, to which DER solicited and received Gardinier's response.
In November 1983, M-88 received formal notice of DER's intent to issue the water pollution permits sought by Gardinier. Section 403.061, Florida Statutes (1983), gives DER the power and duty to "establish a permit system whereby a permit may be required for the operation, construction or expansion of any installation that may be a source of air ... pollution;" Section 403.087(1) states that "no stationary installation which will reasonably be expected to be a source of air ... pollution shall be operated... without an appropriate and currently valid permit." DER provided M-88 with informal, telephonic notice that Gardinier would not be required to obtain an air pollution permit pursuant to these statutes.
M-88 thereupon filed a petition to intervene in Gardinier's permit proceeding, and requested a Section 120.57 hearing on the air pollution issue. Although the hearing officer held that M-88 had "adequately alleged its standing to request a hearing concerning [DER's] notice of intent to issue an industrial waste permit to Gardinier, Inc.," he struck the air pollution issue on the ground that no "agency action" had been taken on such permits. A recommended order to this effect was issued. M-88 filed exceptions, arguing that DER's decision constituted agency action implementing a nonrule policy, i.e., that no air pollution permits would be required from any company with similar phosphate operations. The final order adopted the recommended order, rejecting the exception on the ground that no agency action implementing the alleged nonrule policy had occurred.
During the pendency of the Section 120.57 request, M-88 sought a declaratory statement from DER pursuant to Section 120.565 as to the applicability of the air pollution permit statutes to the phosphate industry in general; M-88, with Lyons, then sought a second declaratory statement as to their applicability to Gardinier in particular. Both petitions were denied because they sought a declaration as to the effect of the statutes on third parties, contrary to Section 120.565.
The petitions for declaratory statement were correctly denied. Section 120.565 provides for an agency's opinion "as to the applicability of a specified statutory provision ... as it applies to the petitioner in his particular set of circumstances only." Lyons and M-88 sought DER's opinion as to the applicability of statutory provisions to Gardinier, contrary to unambiguous *950 statutory language. We affirm on this issue.
We reverse, however, as to the agency's denial of M-88's request for a Section 120.57 hearing. We do not agree with DER's contention that its action with regard to the air pollution issue was not "agency action" within Section 120.52(2), Florida Statutes (1983). The agency relies on the nature of the original permit proceeding into which M-88 intervened, arguing that its only purpose was to determine Gardinier's entitlement to water pollution permits. However, DER itself, with Gardinier's acquiescence and cooperation, created the air pollution issue in the context of that proceeding by its collection and consideration of numerous reports and other information on radioactive emissions. It then made an affirmative decision, which was communicated to M-88, that Gardinier's proposed operation did not require air pollution permits. We hold that, given the circumstances, this communication is the equivalent of an order, and constitutes agency action as defined by Section 120.52(2).
In its exceptions to the recommended order, M-88 argued that DER's action implemented a nonrule policy against requiring air pollution permits for any operation similar to Gardinier's. To the extent an agency may intend to rely upon or refer to such a policy, it must be established by expert testimony, documentary opinion, or other evidence appropriate to the nature of the issue involved and the agency must expose and elucidate its reasons for its discretionary action. Florida Medical Center v. Department of Health and Rehabilitative Services, 463 So.2d 380 (Fla. 1st DCA 1985), citing E.M. Watkins & Co. v. Board of Regents, 414 So.2d 583, 588 (Fla. 1st DCA 1982). Countervailing evidence and argument is permitted. Mcdonald v. Department of Banking and Finance, 346 So.2d 569, 577 (Fla. 1st DCA 1977).
DER did not deny the existence of the nonrule policy in its final order and does not do so before this court. It relies solely on the lack of "agency action" implementing the policy to deny M-88's entitlement to a hearing. Because we find that agency action did occur, the final order denying M-88's request for hearing is quashed, and the case is remanded for proceedings wherein the agency shall explicate its nonrule policy and permit M-88 to present relevant countervailing evidence and argument.
THOMPSON, J., concurs.
SMITH, J., specially concurs with opinion.
SMITH, Judge, specially concurring.
I agree with the results reached by the majority. DER's order dismissing the petitions for declaratory statement should be affirmed for the reasons stated in the majority opinion. I agree also with the majority's conclusion that DER erred in dismissing Manasota-88's petition for a formal hearing on the issue of whether Gardinier should be ordered to apply for an air pollution permit, but I would base this decision on grounds different from those stated by the majority.
As noted by the majority, the hearing officer's order dismissing Manasota-88's petition for a hearing on the air pollution permit issue agreed that Manasota-88 had adequately alleged its standing to request a hearing on the industrial waste water permit, but not as to an air pollution permit. The reasoning of the hearing officer on this point (approved by DER's final order) appears in her order:
It is, however, concluded that the petitioner has no standing to contest the DER's determination that an air pollution permit for this project is not required. There being no pending "proceeding" or application for air pollution permit, there is likewise no agency action concerning which petitioner is entitled to request a hearing.
The majority's opinion does not squarely address the above-stated basis for the hearing officer's (and DER's) ruling. Instead, *951 the majority resolves the controversy by finding that "agency action" occurred, giving Manasota-88 the right to a formal hearing, by reason of DER's actions in requesting, receiving and considering air pollution information from Gardinier, and from Manasota-88, followed by DER's communication, both to Gardinier and to Manasota-88, of its decision not to require an air pollution permit. In deciding the issue on this basis, I believe the majority has perhaps unintentionally enlarged the concept of "agency action" for Section 120.57 hearing purposes beyond the parameters of our prior decisions. At the same time, it appears to me that the majority has also failed to deal with the hearing officer's (and DER's) ruling that air pollution issues cannot be raised by an intervening objector such as Manasota-88 in connection with a water pollution permitting proceeding.
First, as to the "agency action" issue, in the prior appearance of this case, Manasota-88, Inc. v. Department of Environmental Regulation, 441 So.2d 1109 (Fla. 1st DCA 1983), we held that Section 403.412(5), Florida Statutes (1983), does not permit intervention "during the free-form, informal process between the time an application is filed and the notice of proposed agency action is issued."[1]Id. at 1111. We further explained that, until an agency proposes to issue a license or permit, it cannot be said that the objectionable activity is to be "licensed or permitted," as required for Section 403.412(5) to apply. "Thus, licensing proceedings do not commence for purposes of § 403.412(5) until DER issues its notice of proposed action." Id. at 1111. This decision, in my view, indicates that the agency's determination not to require a permitting or licensing application does not authorize intervention by objecting third persons under Section 403.412(5). I believe this view to be a sound one. An agency must be free to gather all relevant information needed to make important day-to-day decisions, and potentially affected parties must be free to provide this information to the agency, without fear that by so doing they may invite intervention by third persons. The cause of environmental protection would not be served by a rule which would act as a deterrent to the state in requesting information, and to the owner or operator of a potential source of pollution in furnishing it.
I would also hold that preliminary, "probable cause" type determinations cannot ordinarily be regarded as agency action triggering the right to a formal Section 120.57 hearing,[2] unless the right to a hearing is supported by the statutory framework guiding the particular agency action in question, or governing the rights of the party requesting the hearing. See, Commission on Human Relations v. Bentley, 422 So.2d 964 (Fla. 1st DCA 1982) (petition to redetermine executive director's finding of no reasonable cause to believe unlawful employment practices occurred does not authorize invocation of Section 120.57 hearing rights); Cf., Publix Supermarkets, Inc. v. Florida Commission on Human Relations, 470 So.2d 754 (Fla. 1st DCA 1985) (Commission's amendment of rule, following decision in Bentley, supra, to allow filing of petitions and securing Section *952 120.57 hearing on determinations or redeterminations of probable cause, etc., held valid); and see, Mikos v. Property Appraisal Adjustment Board, 365 So.2d 757 (Fla. 2d DCA 1978). Thus, DER's preliminary, probable cause decision not to require a permit for a stationary installation because DER does not consider the installation one "which will reasonably be expected" to be a source of air or water pollution, cannot confer upon intervenors the right to a hearing to seek reversal of DER's decision unless a licensing or permitting proceeding covering the same installation is then pending or later instituted. This is so because the statute, Section 403.412(5), confers no rights whatever to intervenors under such circumstances. Nor would such a determination by DER constitute "agency action," since no right is conferred or action mandated by the "no permit" decision.[3]Cf., General Development Utilities, Inc. v. Florida Department of Environmental Regulation, 417 So.2d 1068 (Fla. 1st DCA 1982) (court disagreed with DER's contention that its notice letter to General Development was informational only and without legal or practical effect apart from a prospective licensing proceeding, since the letter set a zero waste load allocation for General Development's sewage treatment plant, and required General Development to change its treatment methods on pain of having its facility shut down).
The foregoing notwithstanding, since there obviously was a pending licensing or permitting proceeding in the case before us, once DER issued its notice of intent to allow construction and operation of the phosphogypsum disposal field,[4] Manasota-88's right to intervention and to challenge DER's failure to deal properly with the air pollution issue ripened under the statute, and it was error for DER to dismiss the petition. Without unduly belaboring the matter further, I would hold that Section 403.412(5), read in pari materia with other pertinent provisions, provides not only for the "standing" of intervenors such as Manasota-88, but also delineates the scope of the relief available to the intervenors. DER's labeling of Manasota-88's efforts to obtain a hearing on the air pollution issue as an attempt to litigate a "collateral" topic is unsupported by authority or reason. It is true that DER is not authorized to grant or deny a pollution permit on grounds other than compliance or non-compliance with applicable pollution control standards and rules. Counsel Of the Lower Keys v. Charley Toppino & Sons, Inc., 429 So.2d 67 (Fla. 3d DCA 1983). However, no logical reason appears to explain how the subject of air pollution can be considered a collateral issue in a proceeding the object of which is to secure an environmental permit for construction and operation of a facility which  assuming Manasota-88 can prove the allegations of its petition  will not only be a source of water pollution, but will also be a source of air pollution.[5] The *953 statute authorizes participation by third persons in such proceedings, and the statute makes no distinction based on the kind of pollution, air or water, which is likely to be produced by the activity sought to be constructed and operated. The sole statutory criterion for intervention is that the proceeding must be one for the "protection" of the air, water, or other natural resources of the state from "pollution." Section 403.412(5). I suspect it would be small comfort to the ordinary citizen if we should accept DER's premise that the state's environmental laws may be administered so as to afford protection from the likelihood of death from water-borne pollution, but provide no protection from deadly air pollution from the same source. Since this interpretation is in clear error, and in conflict with the intent of the statutes, it is an impermissible one. Sans Souci v. Division of Florida Land Sales and Condominiums, 421 So.2d 623 (Fla. 1st DCA 1982).
The crux of this case is simply that before Gardinier may be allowed to proceed with a project that will reasonably be expected to cause water pollution, or air pollution, or both, an "appropriate" permit is required. Section 403.087(1), Florida Statutes (1983). The issue of "appropriateness" is precisely what Manasota-88 seeks to have established: first, by securing a formal administrative hearing, for the purpose of obtaining a determination that the proposed installation is one which will reasonably be expected to produce air pollution;[6] and secondly, based upon such determination, an order that Gardinier be required to apply for an air pollution permit[7] which, if granted, must contain provisions to prohibit or control the projected air pollution to the extent required by applicable laws and regulations.[8]
NOTES
[1] Section 403.412(5) provides:

(5) In any administrative, licensing, or other proceedings authorized by law for the protection of the air, water, or other natural resources of the state from pollution, impairment, or destruction, the Department of Legal Affairs, a political subdivision or municipality of the state, or a citizen of the state shall have standing to intervene as a party on the filing of a verified pleading asserting that the activity, conduct, or product to be licensed or permitted has or will have the effect of impairing, polluting, or otherwise injuring the air, water, or other natural resources of the state.
Although appellees urge that appellant has abandoned its claim of "standing" under Section 403.412(5), I would disagree. Appellant clearly invoked this statute in the proceedings below. Further, the crux of the controversy is not "standing"  since DER did not deny standing generally  but the "scope" of the proceeding in which Manasota-88 intervened.
[2] Section 120.57(40 provides: "This section does not apply to agency investigations preliminary to agency action."
[3] It can hardly be argued that a "no permit required" decision confers any right to construct or operate a source of pollution, since the statutes, and related rules, conclusively prohibit such activities without a permit. Section 403.087(1), Florida Statutes (1983).
[4] DER's "Notice of Proposed Agency Action" gives notice of intent to issue a permit to Gardinier "to construct a phosphogypsum disposal field," and includes provisions relating to systems to monitor surface and ground water quality, but no provisions or conditions relating to air emissions.
[5] DER's position here is diametrically opposed to that taken in del Campo v. State Department of Environmental Regulation, 452 So.2d 1004 (Fla. 1st DCA 1984), in which DER asserted that as a matter of law in reviewing a permit application for "a portion of a project" it may consider the impacts of associated development, even where no application has been received for that development (see DER order, quoted in specially concurring opinion, 452 So.2d at 1006). This court in del Campo agreed with DER's asserted position, while at the same time finding DER in error in denying residents and an environmental group the right to present evidence of environmental impact of proposed island development in connection with permitting proceedings involving a dredge and fill permit for a bridge to the island. The present case before us offers even stronger circumstances favoring Manasota-88's right to interject air pollution concerns into the proceeding, since it is the contemplated installation itself, not some future enterprise or activity, that threatens to pollute the environment. Cf. Caloosa Property Owners' Association v. Department of Environmental Regulation, 462 So.2d 523 (Fla. 1st DCA 1985) (no error in approving dredge and fill for industrial park conditioned upon subjecting all individual site plans to DER's permitting process in accordance with statutes and rules as they may apply).
[6] On this issue, the burden of proof lies with Manasota-88. See, Florida Department of Transportation v. J.W.C. Company, Inc., 396 So.2d 778 (Fla. 1st DCA 1981). In order to prevail, it is only necessary for Manasota-88 to prove that the installation may reasonably be expected to be a source of air "pollution," as statutorily defined, in Section 403.031(2), Florida Statutes (1983):

"Pollution" is the presence in the outdoor atmosphere or waters of the state of any substances, contaminants, noise, or manmade or man-induced alteration of the chemical, physical, biological, or radiological integrity of air or water in quantities or at levels which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property, or unreasonably interfere with the enjoyment of life or property, including outdoor recreation.
[7] On the issue of entitlement to the permit, the burden of proof would lie with the applicant, Gardinier. Rule 17-1.59, Florida Administrative Code.
[8] Section 403.087(4), Florida Statutes (1983).