WOLF, J.
The above-styled cases are consolidated for purposes of this opinion. Appellants are all hospitals with existing trauma centers that petitioned for formal administrative hearings to contest the Department of Health’s (DOH) granting of provisional licenses to nearby hospitals, appellees, to operate new trauma centers. In case 1D12-2998, Shands Jacksonville Medical v. Orange Park Medical Center and State of Florida, Department of Health, appellant Shands Jacksonville Medical (Shands) challenged a provisional license granted to Orange Park Medical Center (Orange Park). In 1D12-3451, Florida Health Sciences Center, Inc., d/b/a Tampa General Hospital, and Bayfront Medical Center, Inc. v. State of Florida, Department of Health and HCA Health Services of Florida, Inc., d/b/a Regional Medical Center Bayonet Point and HCA Health Services of Florida, Inc., d/b/a Blake Medical Center, appellants Bayfront Medical Center (Bayfront) and Tampa General Hospital (Tampa General) challenged provisional licenses granted to appellees Regional Medical Center Bayonet Point (Bayonet Point) and Blake Medical Center (Blake). In 1D12-3453,St Joseph’s Hospital, Inc., d/b/a St. Joseph’s Hospital v. State of Florida, Department of Health, et al., appellant St. Joseph’s Hospital (St.Joseph’s) also challenged the provisional license for Bayonet Point. These petitions were all consolidated below and dismissed by DOH for lack of standing.
We determine that DOH erred in dismissing the challenges for lack of standing because the substantial interests of the existing trauma care centers are within the zone of interest protected by the trauma care statutes, which require DOH to consider the impact that new trauma centers will have on existing trauma centers. We also find the intent to issue a provisional license is a proposed final agency action that existing trauma centers have a right to challenge. See Save Our Creeks v. State of Fla. Fish & Wildlife Conservation Comm’n, 112 So.3d 128 (Fla. 1st DCA 2013).
As noted above, each of the appellants, hospitals with existing trauma centers, alleged in their petitions that their substantial interests were being affected by DOH’s decision to grant provisional trauma center licenses to the applicants. In particular, they realleged the factual findings of an administrative law judge in a rule challenge they previously filed against DOH. In that prior proceeding, appellants challenged rule 64J-2.010 of the Florida Administrative Code, which regulated the apportionment of trauma centers across the state.
After a formal hearing on the rule challenge, the ALJ in that case determined *88 that appellants’ rights would be substantially affected if appellees’ trauma center applications — which were pending at that time — were granted pursuant to the rule. See Bayfront Med. Ctr., Inc., et al. v. Dep’t of Health, Case No. 11-2602RX (Fla.2011) (final order), available at http://doah.state. fl.us/ROS/2011/11002602.pdf [hereinafter Rule Challenge Final Order], The ALJ found “because of the intensity of resources that must be devoted to a trauma center, hospitals generally lose money in their operation.” Id. at 41. Specifically, the ALJ found in 2010, appellant Tampa General’s trauma center had a net loss of $15.7 million; Bayfront’s trauma center lost $8 million; Shands’ trauma center lost $2.7 million; and St. Joseph’s trauma center lost $8.8 million. Id. The ALJ found if appellees’ applications for new trauma centers were granted, these losses would increase. Id. at 45. DOH protocol requires that trauma patients be taken to the closest trauma center. Thus, the ALJ found the new trauma centers would divert patients and revenue away from the existing centers. The ALJ found appellant Bayfront would lose approximately 400 trauma patients a year, which would reduce its profit margins by at least $2.3 million annually. Id. Tampa General would lose 120 patients and over $1 million annually, and St. Joseph’s would lose between 149 to 307 patients annually. Id. Additionally, though appellee Orange Park was not a party to the rule challenge, the ALJ found that if Orange Park’s pending application were approved, Shands would lose 25 percent of its patients and it would lose an additional $6-7 million, for a total of $10 million annually. Id. at 46.
In addition to financial loss, the ALJ found the new trauma centers would cause non-economic injury. The ALJ explained that trauma centers were required to have numerous different kinds of physicians and specialists on call at all times. The ALJ found that “the approval of new trauma centers in relatively close proximity to existing centers will result in increased competition for scarce surgical subspecialists.” Id. at 46. Specifically, the ALJ found the new trauma centers were “likely to increase the difficulty and escalate the cost of ensuring adequate on-call specialty physician coverage for the [appellants’] hospitals and to adversely affect their ability to retain highly skilled nurses, technicians, and other trauma program staff.” Id. at 46-47. Thus, the ALJ concluded appellants demonstrated injury in fact under the Agrico[1] test because the approval of the new trauma centers would “result in an immediate reduction in trauma patient volume as well as increased staffing challenges.” Id. at 50.
In this case, appellees do not contest that appellants will suffer these injuries. However, they argue these injuries are economic in nature and, therefore, insufficient unless the injuries are within the zone of interest protected by statute. Thus, whether or not these injuries are protected by the zone of interest of the relevant trauma center statutes is the crucial issue here.
i. Legislative History and Rule 6IJ — 2.010
The legislative history of the trauma care statutes is outlined in a report prepared by DOH which was directed by the 1998 appropriations bill. Fla. Dep’t of Health, Trauma System Report “Timely Access to Trauma Care” (1999). This report was submitted in this case by appellants below. The report explained that in the early 1980’s, the Legislature passed trauma care legislation that permitted the establishment of trauma care centers by *89 application; however, “there was not a system approach to trauma care.” Id. at 3. In the mid-1980’s there were thirty-three trauma centers in Florida; however, by 1988, there were only twelve. The report stated the cause of this drop was “the cost of providing trauma care and competition for scarce resources.” Id. From 1987 to 1990, multiple studies were conducted, and a proposal was generated for the state to subsidize trauma centers.
The report noted that in 1990, the Legislature passed comprehensive legislation to regulate and partially subsidize trauma centers. Id. at 4; see also Ch. 90-284, Laws of Fla. In what was later codified as section 395.402, the Legislature created nineteen trauma service areas in the state; each service area would have at least one trauma center, with not more than forty-four centers statewide. See Ch. 90-284, § 5, Laws of Fla.; § 395.033, Fla. Stat. (1991) (renumbered as § 395.402 by ch. 92-289, Laws of Fla.). A related statute, later codified as section 395.4025, directed DOH’s predecessor to establish an “approximate number of state-sponsored trauma centers needed to ensure reasonable access to high quality services” within each trauma service area. See Ch. 90-284, § 6(1), Laws of Fla.; § 395.0335(1), Fla. Stat. (1991) (renumbered as § 395.4025 by ch. 92-989, Laws of Fla.) (emphasis added). This section also set forth a list of some of the criteria to be considered in reviewing trauma center applications, including whether the hospital had sufficient facilities and personnel. See Ch. 90-284, § 6(2)(d), Laws of Fla.; § 395.0335(2)(d), Fla. Stat. (1991) (renumbered as § 395.4025 by ch. 92-989, Laws of Fla.) (emphasis added). Further, this section required that new facilities “shall be located in a trauma service area which has a need for such a center.” Ch. 90-284, § 6(5), Laws of Fla.; § 395.0335(5), Fla. Stat. (1991) (renumbered as § 395.4025 by ch. 92-989, Laws of Fla.) (emphasis added).
In response to the legislative directive, DOH’s predecessor promulgated rule 64J-2.010, Florida Administrative Code. Rule 64J-2.010 established the maximum number of trauma centers for each of these nineteen trauma service areas. In the 2011 rule challenge, the ALJ found that DOH implemented this rule by finding that need existed if one of the nineteen trauma service areas had less than the maximum number of allotted trauma centers without referencing any additional data or analysis. Rule Challenge Final Order at 16.

ii. 2004- Statutory Revisions and Rule Challenge

In 2004, the Legislature substantially amended the trauma care statutes. See Ch.2004-259, Laws of Fla. Section 395.402 was amended to state the “Legislature recognizes the need for a statewide, cohesive, uniform, and integrated trauma system.” § 395.402(1),' Fla. Stat. (2004). Further, this section required DOH to conduct a review of the trauma system by February 2005, and every year thereafter, taking into consideration the following:
(2) ... The assessment shall:
(a) Consider aligning trauma service areas within the trauma region boundaries as established in July 2004.
(b) Review the number and level of trauma centers needed for each trauma service area to provide a statewide integrated trauma system.
(c) Establish criteria for determining the number and level of trauma centers needed to serve the population in a defined trauma service area or region.
(d) Consider including criteria within trauma center approval standards based upon the number of trauma victims served within a service area.
*90 (e) Review the Regional Domestic Security Task Force structure and determine whether integrating the trauma system planning with interagency regional emergency and disaster planning efforts is feasible and identify any duplication of efforts between the two entities.
(f) Make recommendations regarding a continued revenue source which shall include a local participation requirement.
(g) Make recommendations regarding a formula for the distribution of funds identified for trauma centers which shall address incentives for new centers where needed and the need to maintain effective trauma care in areas served by existing centers, with consideration for the volume of trauma patients served, and the amount of charity care provided.
(3) In conducting such assessment and subsequent annual reviews, the department shall consider:
(a) The recommendations made as part of the regional trauma system plans submitted by regional trauma agencies.
(b) Stakeholder recommendations.
(c) The geographical composition of an area to ensure rapid access to trauma care by patients.
(d) Historical patterns of patient referral and transfer in an area.
(e) Inventories of available trauma care resources, including professional medical staff.
(f) Population growth characteristics.
(g) Transportation capabilities, including ground and air transport.
(h) Medically appropriate ground and air travel times.
(i) Recommendations of the Regional Domestic Security Task Force.
(j) The actual number of trauma victims currently being served by each trauma center.
(k)Other appropriate criteria.
§ 395.402(2)-(3), Fla. Stat (2004) (emphasis added). This section also required that DOH “shall allocate, by rule, the number of trauma centers needed for each trauma service area.” § 395.402(4)(b), Fla. Stat. (2004) (emphasis added).
Further, section 395.4015 required that rather than using the existing nineteen trauma service areas, DOH “shall establish trauma regions that cover all geographical areas of the state and have boundaries that are coterminous with the boundaries of the regional domestic security task forces established under s. 943.0312.” § 395.4015, Fla. Stat. (2004). Section 395.402(4) clarified that the existing nineteen service areas would remain in place until DOH completed the February 2005 assessment. Moreover, section 395.4025 was also amended in 2004 to state that “until [DOH] has conducted the review provided under s. 395.402, only hospitals located in trauma service areas where there is no existing trauma center may apply.” § 395.4025(14), Fla. Stat. (2004). Section 395.4025 also required that DOH “shall annually notify” existing trauma care centers “that [DOH] is accepting letters of intent from hospitals that are interested in becoming trauma centers.” § 395.4025(2)(a), Fla. Stat. (2004).
Further, section 395.4025 continued to require, as it did in 1991, that applicant hospitals have sufficient facilities and personnel and “be located in a trauma service area that has a need for such a trauma center.” § 395.4025(2)(c), (5), Fla. Stat. (2004). Additionally, subsection (7) stated that:
(7) Any hospital that wishes to protest a decision made by the department based on the department’s preliminary or in-depth review of applications or on the recommendations of the site visit *91 review team pursuant to this section shall proceed as provided in chapter 120. Hearings held under this subsection shall be conducted in the same manner as provided in ss. 120.569 and 120.57. Cases filed under chapter 120 may combine all disputes between parties.
§ 395.4025(7), Fla. Stat. (2004) (emphasis added). These statutes remain largely unchanged today.
This court recently affirmed the ALJ’s determination that rule 64J-2.010 was invalid. Dep’t of Health v. Bayfront Med. Ctr., Inc., — So.3d -, 37 Fla. L. Weekly D2754, 2012 WL 5971201 (Fla. 1st DCA 2012). This court reasoned that although the rule purported to implement sections 395.401, 395.4015, and 395.402, the rule had not been changed since these statutes were “substantially amended.” Id. at D2755. This court noted the rule “continues to set forth nineteen trauma service areas that are not coterminous with the boundaries of the seven regional domestic security task forces.” Id. Further, this court found that DOH completed the 2005 assessment and recommended that the nineteen regions be reduced to seven regions that are coterminous with the task force regions; however, the rule was not amended to reflect this recommendation. Id. Moreover, we noted the rule was not amended to reflect that DOH is now required to conduct an annual review of the trauma regions. Id. Thus, this court concluded the rule contravened DOH’s grant of rulemaking authority and, as such, was an invalid exercise of delegated legislative authority. Id.

in. Zone of Protected Interests

Appellants argue this court should find, as the ALJ did in the rule challenge, that their substantial interests are within the zone protected by the trauma statutes. The ALJ found the approval of appellees’ new trauma centers would “result in an immediate reduction in trauma patient volumes as well as increased staffing challenges” for appellants’ centers which is the type of injury that sections 395.402 and 395.4025 were designed to protect. The ALJ reasoned section 395.402(2) required DOH to review the trauma system to determine the need for additional trauma centers by “taking into consideration specifically identified criteria and factors that directly involve and affect the substantial interests of the [appellants], including but not limited to ‘historical patterns of patient referral and transfer in an area,’ ‘inventories of available trauma care resources, including professional medical staff,’ and ‘stakeholder recommendations.’ “ Rule Challenge Final Order at 53. The ALJ found the statute’s “straightforward purpose is to assess and evaluate the state trauma system as a whole, which includes consideration of the capabilities of existing trauma centers, the availability of the resources needed to provide comprehensive trauma care, and the effect ... within a given region arising from the establishment of a new trauma center.” Id.
Additionally, the ALJ found the Legislature expressly recognized that the substantial interests of hospitals may be affected by the granting of new trauma centers in section 395.4025(7), which states that “[a]ny hospital that wishes to protest a decision made by the department based on the department’s preliminary or in-depth review of applications” may do so through a chapter 120 hearing. Whether or not section 395.4025 provides an independent basis for standing by “provision of statute” as contemplated by section 120.52(13) we need not decide here. The ALJ was correct that appellants’ injuries of economic loss and shortage of available specialists and other *92 service providers are within the zone of interest protected by sections 895.402 and 395.4025.[2]
Shands notes that in the past, DOH has considered the viability of existing providers in implementing the trauma statutes. Below, appellants filed a study conducted by DOH in 2010 entitled “Impact Analysis of Additional Trauma Center Within Trauma Service Area 1,” which stated its purpose was to “examine the impact on existing Escambia County trauma centers, EMS providers, and trauma patients [from surrounding counties] ... if a new trauma center were to open in Okaloosa County.” Also, they submitted a 2011 notice in which DOH approved a “Florida Trauma System Special Study” that it stated was precipitated by a “sudden increase” in trauma center applications that “has caused concern within existing trauma centers that fear the loss of patient volume to sustain professional capability and the loss of marker [sic] share and revenue generated by trauma services.” Thus, DOH approved a study “to assist the department in developing a process and evidence-based guidelines to be utilized by the department in determining the need for trauma center locations throughout the state.”
Moreover, Shands notes that in 1995, DOH granted Tampa General’s request for a formal administrative hearing to contest the approval of a proposed trauma center. That decision was also entered into the record below. Hillsborough County Hosp. Auth., d/b/a The Tampa Gen. Hosp. v. Dep’t of Health & Rehab. Servs., Case No. 94-3669 (Fla. Div. of Admin. Hearings Mar. 3, 1995) (Recommended Order and Final Order), available at http://www. doah.state.fl.us/ROS/1994/94003669.pdf. Appellants argue that this conduct is inconsistent with DOH’s current position regarding standing. Appellees argue this case has no precedential value because there was no indication in the order in that ease that the applicant hospital challenged Tampa General’s standing. However, DOH was also a party to that proceeding, and there was no indication that DOH challenged Tampa General’s standing either. In contrast here, DOH, acting as a party, moved to dismiss based on appellants’ standing, and DOH later adopted the presiding officer’s recommended order dismissing for lack of standing. Thus, appellants’ point that DOH seems to have recently changed its position on this issue is well taken.
Appellees also argue the trauma statutes do not sufficiently identify economic interests as a protected interest. Instead, they argue the trauma statutes put first priority on the needs of the patients, not the needs of the existing trauma centers. They cite section 395.40(2), which states: *93 § 395.40(2), Fla. Stat. (emphasis added). Appellees argue that because the Legislature intends an “inclusive” trauma system that involves all hospitals “with resources to care for the injured trauma victim,” the trauma statutes do not protect the interests of the existing trauma care centers. However, based on the injuries alleged by appellants, the existing trauma centers may not continue to have the financial resources or personnel to care for injured victims if additional trauma facilities are added where there is no need. Moreover, this language in section 395.40 does not nullify the extensive language in section 395.402 which requires DOH to consider factors which would affect existing facilities, including inventories of available trauma care resources and professional medical staff, and stakeholder recommendations. In fact, section 395.402 specifically requires DOH to take into consideration “the need to maintain effective trauma care in areas served by existing centers, with consideration for the volume of trauma patients served, and the amount of charity care provided.” § 395.402(2)(g), Fla. Stat. (emphasis added).
*92 The Legislature finds that it is necessary to plan for and to establish an inclusive trauma system to meet the needs of trauma victims. An “inclusive trauma system” means a system designed to meet the needs of all injured trauma victims who require care in an acute-care setting and into which every health care provider or facility with resources to care for the injured trauma victim is incorporated. The Legislature deems the benefits of trauma care provided within an inclusive trauma system to be of vital significance to the outcome of a trauma victim.
*93 Further, at oral argument, appellee DOH argued that section 395.4025, which pertains to the submission and review of trauma center applications, did not permit DOH to consider need for additional trauma centers when it reviewed applications. Instead, DOH argued this section required it to grant any application that met the statutory criteria. However, section 395.4025(1) specifically requires DOH to “establish the approximate number of trauma centers needed to ensure reasonable access to high-quality trauma services.” § 395.4025(1), Fla. Stat. (emphasis added).
In addition, appellee Orange Park argues the trauma care statutes here are distinguishable from those found to protect competitors’ economic interest in Boca Raton Mausoleum, Inc. v. State, Department of Banking & Finance, Division of Finance, 511 So.2d 1060 (Fla. 1st DCA 1987). In Boca Raton, this court found an existing cemetery had standing to contest the issuance of a license for a new cemetery. Id. at 1062. The existing cemetery alleged it would suffer reduced sales of burial spaces which would result in fewer contributions to its perpetual fund. Id. at 1063. The relevant statute stated the “ ‘Legislature recognizes that purchasers of preneed burial rights or cemetery merchandise may suffer serious economic harm if purchase money is not set aside ... [to] maintain cemetery grounds.’ “ Id. at 1064 (quoting § 497.002, Fla. Stat.). Another statute directed the department to review applications for new cemeteries by considering criteria such as “‘the adequacy of existing facilities,’ “ and need based on the population growth and death rate. Id. (quoting § 497.006(3), Fla. Stat.). It also stated the department could waive the statutory minimum number of cemeteries required “ ‘[i]n order to promote competition.’ “ Id. This court found these statutes created “a zone of interest which encompasses the impact a new licensee will have on existing facilities,” and thus required the department to engage in “an evaluative function that is more than merely ministerial.” Id. at 1064-65. Thus, Boca Raton found, “such [economic] injury must be considered by the department.” Id.
Orange Park argues the statutes at issue in Boca Raton are distinguishable from the trauma statutes because they specifically contemplated economic interest and economic injury. However, as discussed above, the trauma statutes also require DOH to take into consideration the impact that new trauma centers will have on existing facilities and do not require merely a ministerial evaluation of the ap *94 plications. Thus, Boca Raton supports a finding of standing here.
Additionally, Orange Park argues that this court recently distinguished Boca Ra-ton and limited it to its facts in Gadsden Jai Alai, Inc. v. State, Department of Business & Professional Regulation, Division of Pari-Mutuel Wagering, 26 So.3d 68, 69 (Fla. 1st DCA 2010). In Gadsden, this court found petitioners who sought to contest the issuance of a license to a competitor lacked standing because “the permitting statutes governing the issuance of permits for quarter horse racing facilities do not contemplate consideration of the economic interests of other types of parimutuel facilities.” Id. Gadsden distinguished Boca Raton, “where the statutory permitting scheme reviewed specifically contemplated competition and impact on existing facilities would be considered.” Id. Thus, clearly Gadsden did not limit Boca Raton to its facts, but instead reiterated Boca Raton’s holding that economic interests are sufficient to demonstrate standing if the permitting scheme contemplates that the impact on existing facilities will be considered. Here, as discussed above, the trauma statutes clearly require DOH to consider the impact that new trauma centers will have on existing trauma centers.
Appellees also appear to argue that the granting of a “provisional” license is not final agency action subject to challenge by appellants. Based on the statutory provisions that allow a trauma center to operate for a significant period of time on a provisional license, and the allegations of appellants in their complaints concerning the impact upon the operation of existing trauma centers, we reject this contention. See Save Our Creeks v. Fla. Fish & Wildlife Conservation Comm’n, 112 So.3d 128, 130 (Fla. 1st DCA 2013) (citing Manasota-88, Inc. v. Gardinier, Inc., 481 So.2d 948, 950 (Fla. 1st DCA 1986) (determining that “[wjhen an agency binds itself to a course of action in such a way to prevent affected parties from protecting their interests at a later date, final agency action has occurred.”)).
We, therefore, reverse the dismissal of the petitions filed by appellants and direct DOH to send the cases to the Division of Administrative Hearings for formal administrative proceedings.
REVERSED.
LEWIS, C.J., and PADOVANO, J., concur.

. Agrico Chem. Co. v. Dep’t of Envtl. Reg., 406 So.2d 478 (Fla. 2d DCA 1981).

. While we note that there can be a difference between being "substantially affected” for purposes of a rule challenge and having your “substantial interests” affected in the context of a licensing proceeding, we find the ALJ's determinations in the rule challenge to be persuasive in the context of this licensing proceeding. See Fla. Soc'y of Ophthalmology v. State Bd. of Optometry, 532 So.2d 1279, 1287-88 (Fla. 1st DCA 1988).